PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-1503
_____

DOROTHY E. DANIELS,

Appellant

v.

SCHOOL DISTRICT OF PHILADELPHIA;
LESLIE MASON; KENNETH CHRISTY;
RACHEL MARIANNO; KATHERINE PENDINO
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 2:12-cv-02806)
Honorable Harvey Bartle, III, District Judge
_____

Submitted under Third Circuit LAR 34.1(a)
December 12, 2014

BEFORE: VANASKIE, GREENBERG, and
COWEN, Circuit Judges

(Filed: January 20, 2015)

_____

Olugbenga O. Abiona, Esq.
1433 South 4th Street
1st Floor
Philadelphia, PA 19147

Brian M. Rhodes, Esq.
356 North State Road
Springfield, PA 19064

    Attorneys for Appellant

Yvonne B. Montgomery, Esq.
Joe H. Tucker, Jr., Esq.
V. Amanda Witts, Esq.
Tucker Law Group
1617 John F. Kennedy Boulevard
Suite 1700
Philadelphia, PA 19103

    Attorneys for Appellee

_____

OPINION OF THE COURT

_____

GREENBERG, Circuit Judge.

## I.  INTRODUCTION

2

In this discrimination action, plaintiff Dorothy E. Daniels appeals from an order for summary judgment entered on November 7, 2013, in favor of her former employer, the School District of Philadelphia ("SDP"). Daniels alleged in her complaint that SDP violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.; and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951 et seq., both substantively and by retaliating against her because she opposed what she believed was SDP's discriminatory conduct in violation of the acts. Although Daniels was completely unsuccessful in the District Court, we address only her retaliation claim as she does not raise any other issue on this appeal. We conclude that Daniels did not provide sufficient evidence in opposition to SDP's motion for summary judgment to support a conclusion that SDP acted with a retaliatory animus with respect to her. Therefore, we will affirm the order for summary judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In this opinion, we set forth undisputed facts and recite the facts in dispute in a light most favorable to Daniels as the nonmoving party. See McCabe v. Ernst & Young, LLP., 494 F.3d 418, 424 (3d Cir. 2007). Thus, we are not making findings of fact for any purpose beyond these proceedings.

### A. Daniels's Background

Daniels is an African-American educator born on January 2, 1950. She has a masters degree in elementary education and is

3

certified as a reading specialist. From 2003 to 2008, Daniels worked as a guest teacher with Kelly Educational Staffing, and had a good relationship with the principals of the schools to which she was assigned.

In October 2008, following the end of Daniels's relationship with Kelly, SDP employed her as a teacher at Bregy Elementary School in Philadelphia. Her tenure at Bregy seems to have been reasonably successful for during that time her students' standardized test scores improved, and she received compliments from Bregy's principal and an SDP school superintendent. Moreover, Daniels's principal rated her as satisfactory in all categories in a year-end evaluation for the 2008-09 school year. At the end of that school year, however, Daniels was subject to a forced transfer because her position was eliminated due to enrollment or budget allocation changes. Accordingly, Daniels participated in a June 2009 site selection process for the upcoming school year. She elected to teach middle-year English at Thomas Mifflin School, and SDP gave her that assignment. Her troubles with SDP began almost immediately after that assignment.

## B. Thomas Mifflin School

Leslie Mason was Mifflin's principal when SDP assigned Daniels to that school. On a parents' night on or about September 9, 2009, Mason stated that some of the teachers were old enough to be grandparents. Daniels, who was the oldest teacher in the room, took offense to the remark and complained to Mason that she found the statement ageist and offensive. Daniels contends that, following this incident, Mason became antagonistic toward her.

4

In accordance with SDP procedures regarding new teachers at a school, Mason observed Daniels teach several times during her year at Mifflin. Following these observations, Mason evaluated Daniels negatively, an assessment that Daniels contends was unwarranted. For example, Mason gave Daniels a poor evaluation for not using technology, even though Daniels did not have a Smart Board in her classroom and did allow her students to use laptops when she considered their use to be appropriate. Mason also repeatedly commented on the "terrible" appearance of Daniels's classroom, despite the circumstance that Daniels was one of just a few teachers not ordered to clean his or her classroom after an SDP walk-through inspection.

The relationship between Daniels and Mason was strained further because Mason often sent another teacher, Christine Lokey, to provide Daniels teaching support, an assignment that, in Daniels's view, interfered with her teaching regimen. Daniels did not ask for Lokey's assistance, and Mason did not send Lokey to any other teacher's classroom with the same frequency that she sent her to Daniels's classroom. The strain was exacerbated when Daniels learned from a student that Mason had called the student to her office to ask about Daniels's pedagogy.

At the end of the 2009-10 school year, Mason reduced the number of budgeted middle-year teachers for the upcoming year from three to two, an action that required Daniels to go through another forced transfer process. Although SDP's central office, rather than the local principal, decides which teachers to retain and which to transfer, Mason told two students that she "had written [Daniels] out of the budget and that [Daniels] wouldn't be returning in September 2010." App. at 124. Even though SDP had made the decision to transfer Daniels months earlier, it did

not notify Daniels of the decision until September 2, 2010. Consequently, Daniels was unable to participate in that summer's site selection process.

Daniels sent a letter dated September 6, 2010, to SDP's human resources and labor directors, complaining about Mason's treatment of her. In the letter, Daniels again complained about Mason's comment from a year earlier regarding the age of certain of the school's teachers. Daniels also complained that another Mifflin teacher told Daniels, "They call you old school." Id. at 255. In the letter, Daniels further stated that Mason sent Lokey to her classroom "[a]lmost daily" and that this was not her practice with any other teacher. Id. at 254. Daniels raised the following additional matters in her letter: Mason sent other individuals to observe her; Mason herself observed Daniels's teaching at least three times and gave her negative evaluations based on her use of technology and classroom appearance; Mason would not assist Daniels in disciplining her students; Mason called students to her office to ask them about Daniels's pedagogy; and Mason had written Daniels out of Mifflin's budget without notification to Daniels notwithstanding Daniels's repeated request for information about her status for the upcoming year. Daniels concluded in her letter that she "experienced ageism, harassment, and a hostile environment continuously throughout the school year." Id. at 255.

The next day, September 7, 2010, Daniels met with Lissa Johnson, the deputy chief in SDP's staffing office, to ascertain her teaching assignment for the upcoming year. Although Daniels and Johnson did not reach a conclusion during the meeting determining Daniels's assignment for the upcoming year, SDP unilaterally assigned Daniels to teach at E.H. Vare Middle

6

School. However, Daniels did not learn of her assignment to Vare until September 14, a week after her meeting with Johnson. Consequently, Daniels did not attend Vare on September 8, 13, and 14, days on which she would have been at Vare if she had known of her assignment to that school. On September 13 or 14, Johnson directed Vare administrators to designate Daniels as on "unauthorized leave without pay" until she reported. Id. at 213, 215. The record indicates that Johnson learned of Daniels's September 6 letter on September 16, when she received an e-mail from one of its recipients notifying Johnson that Daniels had complained that Mason had harassed her.

Around October 28, 2010, after Daniels had started teaching at Vare, she filed a complaint with the Pennsylvania Human Relations Commission ("PHRC").[1] In the complaint, Daniels asserted an age discrimination claim based on Mason's comment at the parents' night meeting and Mason's frequent monitoring of her through Lokey and others, while younger teachers at Mifflin were not scrutinized similarly. Daniels also asserted a race discrimination claim based on her forced transfer from Mifflin and Mason's failure to give her timely notice of the transfer. On December 30, 2010, Daniels amended her PHRC complaint to include an age discrimination claim based on the forced transfer.

C. Vare Middle School

Daniels's troubles continued at Vare, where Rachel

---

[1] The record suggests that Daniels filed the complaint on November 1, 2010, but the parties and the District Court indicate that she filed the complaint on October 28, 2010. This minor difference is immaterial to the outcome of the case.

7

Marianno and Kenneth Christy served as the principal and assistant principal, respectively. For her first week or two at Vare, Daniels was not assigned to a classroom; instead, she was told either to remain in the main office or to go to the teachers' lounge. Moreover, even after she received a classroom assignment, it took weeks and repeated requests before she was provided with keys to her classroom. Furthermore, Daniels was required to "float" among different classrooms, whereas other teachers did not need to do so.

According to Daniels, students with extreme disciplinary problems and academic challenges were "dumped" into her class, but when Daniels wrote incident reports about her students, Marianno and Christy would not initiate appropriate disciplinary action. Indeed, they did not take disciplinary action when a student stood on Daniels's desk, kicked papers onto the floor, and threatened to "kick [Daniels's] ass," conduct that led Daniels to file a police report. Id. at 127. Marianno and Christy likewise failed to investigate or take disciplinary action when students wrote threats and profanities on the window of Daniels's classroom door. In addition, Marianno refused to discipline one of Daniels's students who loudly used profanity when Marianno observed Daniels's class. At some point during the year, Marianno told Daniels, "If you are not comfortable with the children of this culture perhaps you should leave." Id. at 126. In December 2010, Marianno assigned Daniels to teach subjects for which Daniels did not have a certification.

On December 20, 2010, after Daniels had missed school on December 10 due to illness, Christy sent Daniels a disciplinary attendance memorandum. The memorandum listed Daniels's absences on September 8, 13, and 14 as "unauthorized leave

8

without pay" and warned Daniels that "additional absences or latenesses will lead to more severe disciplinary action." Id. at 213.

On February 22, 2011, Daniels filed a second PHRC complaint, this time concerning her treatment at Vare. In this complaint, Daniels alleged that Christy's attendance memorandum falsely listed her as having taken "unauthorized leave" for a period during which she had not yet been assigned to Vare. She also complained that Marianno had assigned her to teach subjects for which she was not certified, had not provided her with a permanent classroom or keys to any classroom, and assigned students with the worst behavioral problems and the lowest academic scores to her. Daniels claimed that SDP retaliated against her because she had filed her October 28, 2010 PHRC complaint. The certificate of service of the February 22, 2011 complaint is dated April 12, 2011. Marianno and Christy each testified at depositions that they had no knowledge of Daniels's PHRC complaints during the time that they took the adverse actions of which Daniels complains.

During the 2010-11 school year while Daniels was assigned to Vare, Daniels began seeing doctors for anxiety and depression, conditions that she attributed to her hostile treatment at school. Starting in March 2011, Daniels began a period of medical leave from Vare due to her anxiety. While Daniels was on leave, Marianno telephoned Daniels requesting her students' grades. After Daniels faxed her the grades, Marianno called again, screaming at Daniels for the grades' low quality. After the 2010-11 school year ended, Daniels participated in the site selection process for the upcoming year, which resulted in her assignment to teach middle-year literacy at Penrose Elementary

9

School beginning September 2011.

### D. Penrose Elementary School

Daniels's troubles continued at Penrose. On September 6, 2011, the principal at Penrose, Katherine Pendino, called Daniels into her office and, while reviewing Daniels's performance records, asked her, "Do you know what you're doing?" Id. at 129. On or about September 12, 2011, when referring to Daniels, Pendino shouted in the hallway within the hearing of students, staff, and faculty: "[S]he's no good[.] I want her out of here." Id. Similarly, two days later, Pendino stated to Daniels in front of her students, "[Y]ou don't know anything." Id. at 130. Pendino also attempted to write Daniels up for not indicating her time of arrival on the sign-in sheet, even though Pendino had told her that she did not need to do so. Pendino likewise wrote Daniels up for not submitting lesson plans that Daniels actually had submitted weeks earlier.

On or about October 25, 2011, Pendino commented to the school's behavior therapist that Daniels was "no good. I want to get rid of her." Id. During the same month, Pendino instructed Daniels's students to write down anything derogatory or negative that Daniels had said. When parents complained about this direction to their children, Daniels received another write up. Then, on or about November 14, 2011, Pendino told Daniels, "[D]o not return after Christmas break; either retire or resign." Id. As had Marianno and Christy, Pendino testified that she did not know of Daniels's PHRC complaints when she took actions that Daniels regarded as adverse. On December 13, 2011, Daniels supplemented her February 2011 PHRC complaint with a letter listing grievances against Pendino. Daniels v. Sch. Dist. of

10

Phila., 982 F. Supp. 2d 462, 475 (E.D. Pa. 2013).[2]

### E.  Dispute Over Medical Leave

Daniels took another medical leave beginning December 20, 2011.  During the leave, Daniels expected to receive wage continuation benefits, which cover 75 percent of an employee's salary after the employee has exhausted other sick leave.

Under SDP's leave policy, if an employee misses ten consecutive workdays due to personal illness, notice automatically is sent to Carol Kenney, SDP's director of employee health services.  When Kenney's office receives such a notice, it schedules an appointment for the employee with an SDP physician to determine whether the employee has a need for continued leave.  An employee who disagrees with the conclusion of the SDP physician can request that another physician, not in SDP's employ, evaluate her.  If the employee makes such a request, SDP selects that physician from a list of physicians on which SDP and the teachers' union previously had agreed.

In keeping with this policy, Kenney's office scheduled an appointment for Daniels to see Dr. Aribelle Jones, an SDP physician, on January 18, 2012.  Although Jones is not a psychiatrist and, according to Daniels, merely spoke with Daniels without examining her, she concluded that Daniels would be fit to return to work on February 1, 2012.  Daniels did not accept this

---

[2] Although Daniels alludes to this letter in her statement of disputed facts, the parties did not include the letter in the appendix, and Daniels does not rely on it in her brief.  In any event, as we explain below, this letter does not affect the outcome of this case.

11

evaluation and consequently requested that a physician not in SDP's employ evaluate her. Accordingly, SDP scheduled an appointment for her for this purpose with a psychiatrist, Dr. Burton Weiss, from the Penn Diagnostic Center.

Before Daniels's appointment with Weiss, Kenney wrote a letter to him with "background information" about Daniels to the effect that she had taken sick leave the previous school year and had "stated that she was not supported by the principal at her last school." Id. at 244. Kenney also wrote that Daniels "went out again on sick leave in December 2011 with the same complaints of being harassed by her new principal." Id. at 244. The letter asked that Weiss specifically opine on whether Daniels should have returned to work on February 1, 2012.

Weiss examined Daniels on February 13, 2012, and, two days later, he wrote a letter to Kenney opining: "Ms. Daniels's symptoms of anxiety and depression arise from her dispute with the Principal and not from a definable psychiatric illness. Her problem is legal and administrative, not psychiatric." Id. at 247. He therefore determined that Daniels should have returned to work on February 1, 2012, reasoning that psychiatric treatment would not solve the source of her distress.

On February 21, 2012, Kenney notified Daniels of Weiss's conclusion and informed her that if she did not return to work on February 27, 2012, SDP would institute disciplinary proceedings against her. In reliance on Weiss's determination, Kenney also denied Daniels wage continuation benefits. Daniels, however, did not return to work as directed. Rather, based on the opinion of her own physicians, Daniels did not return to work until March 27, 2012. Due to Daniels's failure to return to work as directed, Kenney, who testified that she did not know at that time of

12

Daniels's PHRC complaints, recommended that SDP terminate her employment. On May 2, 2012, Daniels received notice that SDP had initiated the proceedings that ultimately led to the termination of her employment.

### F. Present Lawsuit

On May 22, 2012, Daniels filed suit in the District Court against SDP, Mason, Marianno, Christy, and Pendino, asserting claims of age discrimination, race discrimination, and retaliation. Defendants made a partially successful motion for summary judgment as the Court granted the motion in an order entered November 7, 2013, with respect to most of Daniels's claims, including those of retaliation. See Daniels, 982 F. Supp. 2d at 490. The remainder of the case proceeded to trial, at which the jury returned a verdict in defendants' favor. The Court entered a final judgment on November 22, 2013. Daniels then moved to alter the judgment and for a new trial, but the Court denied that motion on January 29, 2014. Daniels appeals but limits her appeal to challenging the November 7, 2013 order for summary judgment with respect to her retaliation claims against SDP in violation of the ADEA, Title VII, and the PHRA.[3]

### III. STATEMENT OF JURISDICTION AND STANDARD OF REVIEW

The District Court had original federal question jurisdiction over Daniels's ADEA and Title VII claims pursuant to

---

[3] Daniels does not include the individual defendants as appellees on this appeal.

29 U.S.C. § 626(c)(1) and 42 U.S.C. § 2000e-5(f)(3), respectively, and 28 U.S.C. §§ 1331 and 1343. It had supplemental jurisdiction over Daniels's PHRA claim pursuant to 28 U.S.C. § 1367. We have jurisdiction under 28 U.S.C. § 1291.

We exercise plenary review of the District Court's order for summary judgment. Budhun v. Reading Hosp. & Med. Ctr., 765 F.3d 245, 251 (3d Cir. 2014). To warrant summary judgment, the movant must show that, viewing the evidence in the light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 758 (3d Cir. 2004). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512 (1986).

IV. DISCUSSION

The ADEA prohibits an employer from discriminating against an employee with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's age," 29 U.S.C. § 623(a); Title VII prohibits discrimination in employment on the basis of an employee's race, 42 U.S.C. § 2000e-2(a); and the PHRA prohibits discrimination in employment based on both age and race, 43 Pa. Cons. Stat. § 955(a). All three statutes also make it unlawful for an employer to retaliate against an employee for either "oppos[ing] any practice" made unlawful by their respective provisions or for

14

participating "in any manner" in an investigation, proceeding, or hearing under their respective provisions. 29 U.S.C. § 623(d); 42 U.S.C. § 2000e-3(a); 43 Pa. Cons. Stat. § 955(d).

Daniels asserts retaliation claims under each of these statutes. We address these claims together as the circumstances of this case do not require that we make differing analyses. See Barber v. CSX Distribution Servs., 68 F.3d 694, 698 (3d Cir. 1995) ("Because the prohibition against age discrimination contained in the ADEA is similar in text, tone, and purpose to the prohibition against discrimination contained in Title VII, courts routinely look to law developed under Title VII to guide an inquiry under the ADEA."); Burton v. Teleflex Inc., 707 F.3d 417, 432 (3d Cir. 2013) (treating plaintiff's PHRA claims as identical to her ADEA and Title VII claims). In particular, we consider Daniels's claims in this case, in which there is not direct evidence of retaliation, using the burden-shifting framework that the Supreme Court announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973). See, e.g., Moore v. City of Philadelphia, 461 F.3d 331, 342 (3d Cir. 2006) (Title VII); Fasold v. Justice, 409 F.3d 178, 188 (3d Cir. 2005) (ADEA and PHRA).

Under the McDonnell Douglas framework, a plaintiff asserting a retaliation claim first must establish a prima facie case by showing "(1) [that she engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007) (quoting Fogleman v. Mercy Hosp. Inc., 283 F.3d 561, 567-68 (3d Cir. 2002)). If the plaintiff

15

makes these showings, the burden of production of evidence shifts to the employer to present a legitimate, non-retaliatory reason for having taken the adverse action. Id. If the employer advances such a reason, the burden shifts back to the plaintiff to demonstrate that "the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Id. (quoting Moore, 461 F.3d at 342). Although the burden of production of evidence shifts back and forth, the plaintiff has the ultimate burden of persuasion at all times. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143, 120 S.Ct. 2097, 2106 (2000). Using this rubric, we conclude that Daniels cannot support her claims of retaliation and the District Court correctly granted summary judgment against her.

A. Protected Activity

For purposes of the first prong of a prima facie case of retaliation, protected "opposition" activity includes not only an employee's filing of formal charges of discrimination against an employer but also "informal protests of discriminatory employment practices, including making complaints to management." Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006) (quoting Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990)); see Crawford v. Metro. Gov't of Nashville & Davidson Cnty., 555 U.S. 271, 276, 129 S.Ct. 846, 851 (2009) ("'When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication' virtually always 'constitutes the employee's opposition to the activity.'" (alteration in original)). That is, in determining whether a plaintiff adequately opposed

16

discrimination, "we look to the message . . . conveyed [by a plaintiff's conduct] rather than the means of conveyance." Moore, 461 F.3d at 343 (quoting Curay-Cramer, 450 F.3d at 135). The complaint must allege that the opposition was to discrimination based on a protected category, such as age or race. See Slagle v. Cnty. of Clarion, 435 F.3d 262, 266-67 (3d Cir. 2006); Barber, 68 F.3d at 702. Furthermore, although a plaintiff in a retaliation case "need not prove the merits of the underlying discrimination complaint," she must have "act[ed] under a good faith, reasonable belief that a violation existed." Moore, 461 F.3d at 344 (quoting Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1996)). This standard requires an "objectively reasonable belief" that the activity the plaintiff opposed constituted unlawful discrimination under the relevant statute. Wilkerson v. New Media Tech. Charter Sch. Inc., 522 F.3d 315, 322 (3d Cir. 2008) (quoting Moore, 461 F.3d at 341).

In Clark County School District v. Breeden, 532 U.S. 268, 270, 121 S.Ct. 1508, 1509 (2001) (per curiam), the Supreme Court rejected a plaintiff's retaliation claim as the Court concluded that no reasonable person could have believed that the conduct of which she had complained constituted sex discrimination under Title VII. The plaintiff had complained about an incident in which, while she was reviewing job applicants with a male supervisor and another male employee, the supervisor commented to her that he did not understand a sexually explicit statement that one of the applicants had made. At that time, the other male employee responded, "Well, I'll tell you later," and both men chuckled. Id. at 269-70, 121 S.Ct. at 1509. The Court noted that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of

17

employment'" so as to violate Title VII, and held that the single incident described in that case could not remotely satisfy this standard. Id. at 271, 121 S.Ct. at 1510 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 2283 (1998)). Accordingly, the plaintiff's complaint about this incident did not qualify as protected activity. See id. at 270, 121 S.Ct. at 1509.

Daniels asserts that she engaged in the following instances of protected conduct: (1) she complained to Mason about Mason's grandparents comment during the parents' night meeting; (2) she complained to Mason about excessive monitoring that other teachers did not experience; (3) she sent the September 6, 2010 letter to SDP administrators claiming that she had been subjected to a hostile work environment because of her age; (4) she filed the October 2010 PHRC complaint and the December 2010 amendment to that complaint, in which she claimed age and race discrimination based on the hostile work environment she experienced at Mifflin and her forced transfer from that school; and (5) she filed the February 2011 PHRC complaint claiming that Marianno and Christy had retaliated against her at Vare for engaging in protected activities.

Our review satisfies us that Daniels cannot show that the first two of these activities constituted protected conduct, but that she can make that showing with respect to the last three activities. First, Daniels's complaint to Mason about the grandparents comment is not a protected activity because no reasonable person could believe that Mason's statement, by itself, constituted unlawful age discrimination. Daniels complained that it was ageist and offensive for Mason to state publicly that some of the teachers are old enough to be grandparents. However, the term "grandparents" is not inherently derogatory, and Mason's

18

isolated "offhand comment" did not name Daniels or any other teacher or explicitly denigrate the ability of older teachers to perform their duties. See Breeden, 532 U.S. at 271, 121 S.Ct. at 1510; cf. Kargbo v. Phila. Corp. for Aging, 16 F. Supp. 3d 512, 532 (E.D. Pa. 2014) ("[The supervisor's] comments about Plaintiff's age are more serious than the single off-color remark in Breeden because they were explicitly directed at Plaintiff and referred to his ability to do his job."). Contrary to Daniels's contention, her subjective belief that Mason's statement violated the ADEA does not suffice for her complaint to qualify as protected conduct. See Curay-Cramer, 450 F.3d at 137 ("[The plaintiff's] subjective state of mind is . . . irrelevant for purposes of determining whether she engaged in protected conduct.").

Likewise, with respect to her second alleged category of protected conduct, Daniels does not point to any evidence in the record showing that she made complaints to Mason about excessive monitoring. Moreover, she fails to demonstrate that she related her complaints to age or race discrimination such that the complaints could have qualified as protected activity under the anti-discrimination statutes. See Slagle, 435 F.3d at 268 (holding that plaintiff's "vague allegations of 'civil rights' violations," without reference to discrimination based on any protected category, did not constitute protected conduct under Title VII); Barber, 68 F.3d at 702 (holding that plaintiff's "general complaint of unfair treatment d[id] not translate into a charge of illegal age discrimination" under the ADEA). In considering what activities constitute protected conduct, we emphasize that anti-discrimination employment statutes are not intended to establish general standards for conduct of employers in dealing with employees. See Curay-Cramer, 450 F.3d at 135; Slagle, 435 F.3d at 266-67; Barber, 68 F.3d at 702.

19

But even though Daniels cannot successfully predicate a claim based on her first two categories of what she claims was protected conduct, she has made a showing sufficient to satisfy the first prong of her prima facie case based on the other three categories of such conduct. In her September 6, 2010 letter, Daniels complained not only of Mason's "ageis[t]" comment and her fellow teacher's reference to her as "old school" but also of the frequent monitoring of her teaching and classroom preparation, the lack of assistance in disciplining her students, Mason's negative written evaluations, Mason's questioning of students about her pedagogy, and the failure of Mason or SDP to inform her of her teaching status for the upcoming school year despite her repeated requests for such information. App. at 254-55. Toward the end of the letter, Daniels summarized her complaints by stating that she "experienced ageism, harassment, and a hostile work environment throughout the school year." Id. at 255. Daniels reasonably and in good faith could have believed that such pervasive harassment constituted unlawful age discrimination, and a factfinder could conclude that the letter alleged age discrimination in terms sufficient to qualify the sending of the letter as protected conduct under the ADEA and the PHRA. Furthermore, Daniels's formal complaints to the PHRC containing similar allegations of mistreatment based on age, race, and prior protected conduct unquestionably qualify as protected activities. See Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997); Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989). We therefore turn to the second prong of Daniels's prima facie case.

B. Adverse Action

For an employer's action to satisfy the second prong of a

20

prima facie case of retaliation, the plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S.Ct. 2405, 2415 (2006) (internal quotation marks omitted); accord Moore, 461 F.3d at 341. We examine the challenged conduct "from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Burlington N. & Santa Fe Ry. Co., 548 U.S. at 71, 126 S.Ct. at 2417 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S.Ct. 998, 1003 (1998)). "[P]etty slights, minor annoyances, and simple lack of good manners" generally will not suffice. Id. at 68, 126 S.Ct. at 2415. However, "[c]ontext matters" such that "an act that would be immaterial in some situations is material in others." Id. at 69, 126 S.Ct. at 2415-16 (quoting Washington v. Ill. Dep't of Revenue, 420 F.3d 658, 661 (7th Cir. 2005) (internal quotation marks omitted)).

Daniels alleges that SDP engaged in numerous instances of adverse conduct: (1) her forced transfer from Mifflin in the summer of 2010 and SDP's failure to inform her of the transfer in time for her to participate in that year's site selection process; (2) the designation of her absences on September 8, 13, and 14, 2010, as "unauthorized leave without pay," even though SDP did not notify her of her assignment to Vare until September 14, and Christy's related memorandum of December 20, 2010, warning Daniels that additional absences or lateness would lead to more severe disciplinary action; (3) the hostile work environment that Daniels experienced at Vare and Penrose from September 2010 to December 2011, which caused her mental health injuries; (4)

the denial of her wage continuation benefits; and (5) SDP's eventual termination of her employment.

We need not consider the first alleged instance of adverse action as Daniels's forced transfer without notification preceded her first protected activity — the September 6, 2010 letter to SDP administrators — and therefore was not "after or contemporaneous with" her protected conduct. See Marra, 497 F.3d at 300; Slagle, 435 F.3d at 266. Each of the other instances of adverse action, however, occurred after Daniels's first protected activity, and each could have dissuaded a reasonable person in her position from charging discrimination. Consequently, they satisfy the second prong of her prima facie case. See, e.g., Moore, 461 F.3d at 348 ("pattern of harassment" sufficed); LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007) (termination of employment clearly suffices); Abramson v. William Paterson Coll., 260 F.3d 265 (3d Cir. 2001) (same). Thus, as is often true in retaliation cases, this case turns on whether the plaintiff, here Daniels, can establish that there was a causal connection between her protected activities and SDP's adverse actions.

C. Causal Connection

"We consider 'a broad array of evidence' in determining whether a sufficient causal link exists [for a plaintiff] to survive a motion for summary judgment." LeBoon, 503 F.3d at 232 (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 284 (3d Cir. 2000)). To demonstrate a link between protected activity and an employer's adverse action, a plaintiff may rely on the temporal proximity between the two if "unusually suggestive." Id.; Marra, 497 F.3d at 302. In the absence of such a close temporal proximity, we consider the circumstances as a whole, including

22

any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action. See LeBoon, 503 F.3d at 232-33; Marra, 497 F.3d at 302; Farrell, 206 F.3d at 280-81. The plaintiff, however, cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted. See Andreoli v. Gates, 482 F.3d 641, 650 (3d Cir. 2007); Moore, 461 F.3d at 351; cf. Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct.").

Daniels did not proffer sufficient evidence of causation to survive SDP's motion for summary judgment. As to the adverse action with respect to Daniels's classification for September 8, 13, and 14, 2010, Johnson, then deputy chief in SDP's staffing office, on September 13 or 14 directed that Daniels be designated as having taken "unauthorized leave without pay." App. at 215. These absences then triggered Christy's December 20, 2010 attendance memorandum following Daniels's absence ten days earlier. The record, however, does not contain any evidence that Johnson learned of Daniels's September 6, 2010 letter until September 16, 2010, when she received an e-mail referencing that complaint (but not mentioning its claim of age discrimination).[4] Id. at 216. Likewise, Christy testified at his

---

[4] Johnson's response to that e-mail does note that on September 13, 2010, Daniels "made allegations against Leslie Mason" during a telephone call with Johnson. App. at 215. However, the record

23

deposition that he had no knowledge of Daniels's complaints. Daniels offers nothing to rebut this evidence that the decision makers respectively responsible for her designation as having taken "unauthorized leave without pay" and the subsequent warning lacked knowledge of her protected conduct. She therefore cannot establish that there was a causal connection between her protected activities and such adverse action. See Sarullo v. U.S. Postal Serv., 352 F.3d 789, 801 (3d Cir. 2003) (per curiam); Ambrose, 303 F.3d at 493.

Daniels similarly cannot establish that there was a causal connection between her protected activities and the hostile work environment that she allegedly experienced from September 2010 to December 2011. The persons responsible for this alleged harassment, Marianno and Christy at Vare and Pendino at Penrose, all testified that they lacked knowledge of Daniels's protected conduct. As the basis for establishing such knowledge, Daniels points to the unexplained hostility of these individuals toward her immediately upon her arrival at each of the schools. We recognize that when there is a brief period of time between an adverse actor's learning of a plaintiff's protected conduct and a subsequent adverse action, it may be reasonable to infer that there was a causal link between the two events. But the temporal proximity of adverse action to protected conduct does not establish that the adverse actor had knowledge of the protected conduct before acting. See Moore, 461 F.3d at 351-52; Ambrose, 303 F.3d at 493.

Furthermore, Daniels cannot justifiably rely on mere

does not contain any evidence regarding the content of those allegations, and Daniels does not cite this conversation as an instance of protected activity.

speculation that these adverse actors learned of her complaints from other employees in the school district. See Sarullo, 352 F.3d at 799 (rejecting plaintiff's speculation that adverse actor learned of plaintiff's race through office "grapevine," where their offices were located miles apart). A factfinder potentially could infer that Marianno and Christy knew of Daniels's February 2011 PHRC complaint because it contained specific allegations against them, but Daniels contends that Marianno and Christy began their harassment of her months earlier, at the start of the school year in September 2010. She therefore cannot link such hostile treatment to their knowledge of this complaint. See LeBoon, 503 F.3d at 233-34 (no causation where plaintiff's tense relationship with her supervisor began prior to her protected activity); cf. Breeden, 532 U.S. at 272, 121 S.Ct. at 1511 (no causal link between plaintiff's lawsuit and her subsequent transfer where employer "concededly was contemplating the transfer before it learned of the suit").

Daniels fares only slightly better with respect to the last two alleged instances of adverse action. Kenney, SDP's director of employee health services, was responsible both for denying Daniels's wage continuation benefits and for subsequently recommending her termination. Although Kenney testified that she did not know of Daniels's PHRC complaints, Daniels has presented evidence to rebut this testimony. For example, in her letter to Weiss, Kenney noted that Daniels had complained of harassment by her principals, suggesting that Kenney knew of Daniels's conflicts with SDP, including her retaliation claims.

Nevertheless, Daniels fails to establish a causal link between her protected activities and these adverse actions. She has not shown an "unusually suggestive" temporal proximity as ten months passed between the service of the February 2011

25

PHRC complaint on SDP on April 12, 2011, and the denial of her wage continuation benefits in February 2012. See LeBoon, 503 F.3d at 233 ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment."); Andreoli, 482 F.3d at 650 (holding five-month time period between complaint and first adverse action insufficient by itself to support inference of causation). Moreover, Daniels cannot rely on the intervening antagonism she allegedly faced because, as discussed above, she cannot show that there was a causal relationship between her protected conduct and this antagonism.

When we take into account Daniels's December 13, 2011 supplement to her February PHRC complaint, we perhaps could conclude that Daniels made a prima facie showing of causation between her protected activities and the adverse action given that only three months passed between the filing of the supplement and the denial of her wage continuation benefits. After all, Daniels's medical leave began soon after she submitted this supplement, and it took that long for SDP to go through the formal process of obtaining examinations of Daniels by Jones and Weiss. See Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997) ("When there may be valid reasons why the adverse employment action was not taken immediately, the absence of immediacy between the cause and effect does not disprove causation."). Yet even assuming Daniels can make such a prima facie showing, SDP has proffered legitimate reasons for these adverse actions, which Daniels has failed to rebut. See Estate of Oliva ex rel. McHugh v. New Jersey, 604 F.3d 788, 799-800 (3d Cir. 2010).

According to SDP, it denied the wage continuation benefits based on Weiss's determination that Daniels was fit to return to work, and then terminated her employment because she failed to return in a timely way. To avoid summary judgment once the employer has articulated legitimate reasons for its adverse actions, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious [retaliatory] reason was more likely than not a . . . determinative cause of the employer's action." Fuentes v. Perksie, 32 F.3d 759, 764 (3d Cir. 1994). The plaintiff "cannot simply show that the employer's decision was wrong or mistaken" but rather "must demonstrate such 'weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] nondiscriminatory reasons.'" Ross v. Gilhuly, 755 F.3d 185, 194 n.13 (3d Cir. 2014) (alteration in original) (quoting Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 331 (3d Cir. 1995)).

Daniels challenges SDP's reliance on Weiss's determination that she could return to work, pointing to evidence that her own physicians did not consider her fit to return and disputing the basis of Weiss's conclusion to the contrary. Daniels's argument mirrors an argument that we rejected in Estate of Oliva, 604 F.3d at 801. There, the plaintiff challenged as retaliatory the defendant's determination that he could return to full duty status, a conclusion that was contrary to his own physicians' recommendations. See id. The defendant responded that he reasonably had relied on a determination of fitness for

27

duty made by an independent medical center. See id. We agreed that the defendant legitimately could rely on that independent medical evaluation, notwithstanding its inconsistency with the plaintiff's own physicians' opinion, and therefore we affirmed an order for summary judgment in the defendant's favor. See id. SDP likewise reasonably relied on Weiss's opinion particularly because he was an independent physician not within its employ. It does not matter that this opinion differed from that of Daniels's physicians. Nor does it matter whether, as Daniels argues, this opinion was mistaken. See Ross, 755 F.3d at 194 & n.13; Fuentes, 32 F.3d at 766-67.

Daniels also asserts that Weiss was biased in favor of SDP. However, nothing in the record, including Kenney's letter to Weiss, suggests that SDP improperly influenced him when he stated his opinion, and Daniels cannot rest on mere speculation of bias. See Fuentes, 32 F.3d at 766 (declaring that plaintiff's allegation of bias "amount[ed] to little more than the schoolground retort, 'Not so,'" and "d[id] not create a material issue of fact"). Indeed, the teachers' union could have sought to have Weiss removed from the pool of independent physicians if it considered him biased in SDP's favor, but the record does not contain any evidence that it took such action. Moreover, Daniels does not contend in her brief that she personally or through counsel objected to Weiss evaluating her. Although SDP may have harassed Daniels, she has not linked any of the harassment to the sort of retaliatory animus necessary to obtain relief under the anti-discrimination statutes on which she relies. See Moore, 461 F.3d at 342 ("Many may suffer . . . harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, [the ADEA, or the PHRA,] it follows that [those statutes] provide[] no relief." (first alteration in original) (quoting

28

Jensen v. Potter, 435 F.3d 444, 449 (3d Cir.2006).

## V.  CONCLUSION

For the foregoing reasons, we will affirm the District Court's grant of summary judgment in favor of SDP entered on November 8, 2013.