**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-4325
_____

CLARENCE B. THOMPSON,
                              Appellant

v.

KELLOGG'S USA
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(D.C. No. 4:12-cv-02528)
District Judge: Hon. Matthew W. Brann
_____

Submitted Under Third Circuit LAR 34.1(a)
July 17, 2015
_____

Before: SMITH, GREENAWAY, JR. and SHWARTZ, <u>Circuit Judges</u>.

(Filed: July 20, 2015)
_____

OPINION[*]
_____

SHWARTZ, <u>Circuit Judge</u>.

    Clarence B. Thompson appeals from the District Court's grant of summary

judgment in favor of Kellogg's USA ("Kellogg") on Thompson's retaliation claim under

_____
    [*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), and the Pennsylvania Human Relations Act, 43 Pa. Con. Stat. Ann. § 951 ("PHRA"). We will affirm.

## I

Thompson worked at Kellogg's bakery in Muncy, Pennsylvania, operating the machines that mix icing for Pop-Tarts. A Collective Bargaining Agreement ("CBA") set forth the terms and conditions of Thompson's employment and the "Plant Work Rules" provided for progressive discipline for infractions. App. 123.

Thompson used a computer screen and checklist to perform his icing mixing duties. A computer screen prompted Thompson to send hot water into the icing mixer and to add gelatin, a thickening agent. The machine automatically added sugar to the icing mix. Once the computer screen signaled that the blending of hot water, gelatin, and sugar was complete, Thompson had to press a button to send the icing into a separate holding tank. Thompson was responsible for ensuring that the holding tank was not empty.

During Thompson's April 27, 2011 shift, an icing holding tank ran out of icing and another holding tank nearly emptied, causing the operations on the Pop-Tart line to stop. Kellogg operations supervisor Lori Buss investigated the incident. When she arrived at the icing mixing area, she saw Thompson sitting on a chair leaning against a bag of gelatin while lights blinked on both of the icing mixers, which indicated that an

2

employee needed to prompt the computer to take the next step in the mixing process. Buss summoned a second supervisor to determine whether Thompson was sleeping.

Buss later spoke to two other employees about the incident. One employee told Buss that he believed Thompson was sleeping during his shift when the Pop-Tart line went down. Based on her investigation, Buss believed that Thompson fell asleep. Thompson conceded that the icing holding tank became empty during his shift, but he denied sleeping, and maintained that the tank was "not full" when his shift began and would not stay full because "[t]hey were running so fast." App. 418.

Thompson was suspended for three days and received a "final Group II written warning," App. 126, which omitted any reference to sleeping and cited his "serious neglect of work" for "[f]ail[ing] to complete steps in the process and allow[ing the] icing tank to empty causing 13 min[utes] of [down time]," App. 64. The warning also stated that any additional infractions would lead to "further disciplinary action up to and including termination." App. 64.

Several weeks after he returned to work, Kellogg employee relations manager Chris Boschi called Thompson into her office to speak with him about an insulin shot Thompson had administered to himself in a hallway sanitation closet. During this conversation, Thompson asked Boschi why the company did not "hire more black people?" and stated "not to be indignant or anything like that, but you have seven, eight, nine hires, and not one employee is black." App. 420. Boschi wrote down Thompson's concerns, said she would pass them along to a Kellogg human relations manager, and

3

invited Thompson to make an appointment to further discuss his concerns. Thompson never did so.

Thompson also testified that during an earlier conversation with Boschi, he asked her "about bringing some diversity training or diversity meetings back to" the Muncy bakery in light of racial slurs Thompson allegedly heard while working at the bakery. App. 420. Thompson recalled raising similar concerns with other members of Kellogg's management team at various times and that they "would tell [him,] don't give up on your ideas." App. 436.

Several months later, on August 19, 2011, a batch of icing Thompson prepared had to be discarded because the icing was too thin. Although Thompson reported on the mixing worksheet that he had added gelatin to this batch of icing, he later admitted that he had not done so. His misreporting of the gelatin on the mixing worksheet violated Kellogg's mixing procedures and cost the company in "scrap" and downtime. App. 63. As a result, and in light of the "final Group II written warning" he had received for the April 27th incident, App. 126, Kellogg terminated Thompson.

Thompson contested his termination through the CBA's grievance process. During the process, Kellogg and his union signed a "Last Chance Agreement" allowing Thompson to keep his job. App. 128, 175. The Last Chance Agreement provided, however, that Thompson would be terminated if he violated any work rules within the following 12 months, "regardless of circumstances." App. 65.

4

Six weeks after he signed the Last Chance Agreement, Thompson committed another work rule violation. On October 17, 2011, Thompson was assigned to place malic acid into individual plastic containers, label each container with the name of the corresponding product, and complete a worksheet with information that included the name of the ingredient and the date it was packaged. Although Thompson placed the malic acid into 75 individual containers, he failed to label any of the containers or to date the worksheet. As a result, on October 31, 2011, Kellogg issued Thompson a written warning for failing to label the malic acid containers and for failing to include required information on the worksheet and terminated Thompson.

Thompson explained that he did not complete the worksheets or label the containers because a Kellogg supervisor directed him to "help out" another line that "was having problems." App. 459. Thompson told the supervisor, "I'm not done here yet," to which the supervisor responded, "don't worry about that." App. 459.

Thompson also testified that, as an icing mixer, he regularly received malic acid containers without labels and that Kellogg did not typically throw away those containers simply because they were not labeled. Kevin Glenn, another Kellogg employee, testified that while supervisors sometimes attempted to track down where unlabeled items came from in order to put labels on them, the unlabeled items were "usually" "throw[n] . . . away." App. 486. Glenn, who had worked for Kellogg since 1993, could not recall any time a Kellogg employee was terminated for failing to label an item.

5

Following his termination, Thompson brought this action against Kellogg claiming race discrimination and retaliation under Title VII and the PHRA. The District Court adopted the Magistrate Judge's recommendation that Kellogg's motion for summary judgment be granted, and Thompson appeals.

II[1]

Thompson appeals the grant of summary judgment on only his retaliation claim under Title VII and the PHRA. "A prima facie case of illegal retaliation requires a showing of (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." EEOC v. Allstate Ins. Co., 778 F.3d 444, 449 (3d Cir. 2015) (quoting Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002)). As to causation, the employee must show that the employer's "desire to retaliate was the but-for cause of the challenged employment action" such that "the unlawful retaliation would not have occurred in the

---

[1] The District Court had jurisdiction over Thompson's Title VII claims under 28 U.S.C. § 1331 and supplemental jurisdiction over Thompson's PHRA claim under 28 U.S.C. § 1367. We have jurisdiction under 28 U.S.C. § 1291.

We exercise plenary review of the District Court's grant of summary judgment. Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 192 (3d Cir. 2015). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed issue is "genuine" only "if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). We view the facts and draw all reasonable inferences in the non-movant's favor. Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 266–67 (3d Cir. 2005).

absence of the alleged wrongful action or actions of the employer." Univ. of Tex. Sw.

Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2528, 2533 (2013).[2]

"To establish the requisite causal connection[,] a plaintiff usually must prove

either (1) an unusually suggestive temporal proximity between the protected activity and

the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to

establish a causal link." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d

Cir. 2007). On this latter point, we generally "look to the intervening period for

demonstrative proof, such as actual antagonistic conduct or animus against the employee,

. . . inconsistent reasons given by the employer for terminating the employee[,] or the

employer's treatment of other employees." Marra v. Phila. Hous. Auth., 497 F.3d 286,

302 (3d Cir. 2007). Here, Thompson does not challenge the Magistrate Judge's

conclusion that the temporal proximity between his protected activity and suspension or

termination was not unusually suggestive of retaliatory animus. Instead, Thompson

contends that there "is ample evidence in the record to infer a causal connection" between

his comments about diversity training and hiring practices and his suspension and

termination. Opening Br. 12.

The record, however, does not support this contention. Thompson conceded that

the "only" evidence supporting his position that Kellogg terminated him because of his

comments was his own "belief," App. 437, and that he has no knowledge of who at

---

[2] We apply the same legal standards to Thompson's PHRA claim. Jones v. Sch. Dist. of Phila., 198 F.3d 403, 409 (3d Cir. 1999).

Kellogg made the decision to terminate him. Further, the October 17th incident immediately preceding his ultimate termination occurred months after his comments to human resources and after Kellogg agreed to reinstate him pursuant to the Last Chance Agreement, which expressly provided: "[a]ny work rule violation, regardless of circumstances, during the lifetime of this agreement will result in immediate termination." App. 65; see, e.g., Krouse v. Am. Sterilizer Co., 126 F.3d 494, 504 (3d Cir. 1997) (affirming summary judgment on Title VII retaliation claim where employer, after placing Krouse on worker's compensation leave, returned Krouse to previous position "after Krouse filed his EEOC charge"). Notably, this Last Chance Agreement was tendered after he raised his concerns about Kellogg's practices and the need for diversity training. Kellogg's willingness to continue Thompson's employment after his comments undermines any link between his comments and his termination, as his comments were in fact followed by reinstatement. On this record, therefore, we conclude that Thompson failed to introduce "demonstrative proof" of retaliatory animus or other circumstances suggesting that his termination was a result of Kellogg's retaliatory animus.

Thompson's assertions that he "was given inconsistent reasons by [Kellogg] with respect to his May 10, 2011 warning" and "received more swift and harsh punishment than Caucasian employees who continued to be employed," Opening Br. 15, do not change this conclusion. As to "inconsistent reasons," Thompson relies on the fact that the Kellogg supervisor who investigated the April 17th incident did not record on the written warning that Thompson may have been asleep. The supervisor testified that she

omitted this information because Thompson had awakened by the time a second Kellogg manager arrived at the scene. Even if the supervisor was mistaken about Thompson sleeping, such a "mistaken apprehension," absent specific evidence that the reason for the omission was retaliatory, "does not automatically transform" that actor's motivation into a retaliatory one. Lauren W., 480 F.3d at 270 (finding decisionmaker's "mistaken apprehension" regarding an event involving plaintiffs "unpersuasive" as evidence of retaliatory animus where plaintiffs "failed to put forth even one specific fact to support an inference that [decisionmaker] took her actions in retaliation"). If anything, the absence of any reference to a belief that Thompson had been sleeping militates against an inference of retaliatory animus as it omitted negative information about Thompson. In any event, Kellogg's explanation for suspending and subsequently terminating Thompson, given the undisputed evidence that he failed to perform his duties three times between April and October 2011 and violated the Last Chance Agreement, "is not so inconsistent or incongruous" as to raise an inference of a retaliatory animus. LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 234 (3d Cir. 2007).

Similarly unavailing is Thompson's claim that he "received more swift and harsh punishment than Caucasian employees."[3] Opening Br. at 15. Generally speaking, a

---

[3] Thompson's brief also discusses testimony from "other African American employees [that] . . . painted a picture of the racially discriminatory atmosphere" at Kellogg. Opening Br. 15. While this discussion may have been probative on his abandoned race discrimination claim and provided support for the views he shared with human resources, it does not establish his claim that he was fired for speaking out about Kellogg's hiring practices and need for diversity training.

plaintiff claiming "that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason . . . must show that he is similarly situated with respect to performance, qualifications, and conduct," which "normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Radue v. Kimberly–Clark Corp., 219 F.3d 612, 617–18 (7th Cir. 2000). While Thompson contends that other Kellogg employees made "major mistakes" without being terminated, Opening Br. 20, and that other African American employees "have made race discrimination complaints against Defendant," Opening Br. 21, he produced no evidence that these employees held similar positions, had similar disciplinary records, were subject to a Last Chance Agreement, or reported to the same decisionmakers when they made these mistakes or complaints. Thus, Thompson has failed to identify any similarly situated comparator and so the treatment of these other individuals does nothing to advance his retaliation claim. See, e.g., Lauren W., 480 F.3d at 269 (finding that plaintiff–student's comparison to other students "did not have evidentiary value on the retaliation issue as they were not similarly situated").

## III

For the foregoing reasons, we will affirm the judgment of the District Court.

10