**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-3297
_____

JESSICA HARRISON-HARPER
                                                            Appellant

v.

NIKE INC., D/B/A CONVERSE, INC.

_____

On Appeal from the United States District Court for the
Eastern District of Pennsylvania
(No. 2-16-cv-04645)
District Judge:  Hon. Mitchell S. Goldberg

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
September 9, 2019

Before:  CHAGARES, JORDAN, and RESTREPO, Circuit Judges.

(Filed October 11, 2019)

_____

OPINION[*]
_____

_____

        [*]This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does
not constitute binding precedent.

CHAGARES, Circuit Judge.

Jessica Harrison-Harper appeals the District Court's grant of summary judgment in favor of Nike, Inc., d/b/a Converse, Inc., ("Nike"), as to her retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. and under the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951, et seq. For the following reasons, we will affirm.

I.

The following facts are not disputed. Harrison-Harper was hired in July 2014 as a Store Manager at a Converse store. She reported to the District Manager, Josh Sanders, and he reported to the Director of Stores, Kimberly Kiefer. As Store Manager, Harrison-Harper coordinated and supervised staff and was accountable for her store's performance as well as protection of the Nike/Converse brand. Sales associates and leads reported to Harrison-Harper. Jessica Lepera started as a sales associate, and Harrison-Harper promoted her to lead within two months.

On September 24, 2015, Kiefer copied Sanders on an email regarding a customer complaint against Harrison-Harper for her refusal to accept a return of a pair of shoes. Nike has a policy to "take care of the customer" and managers are instructed to refuse returns only in rare instances. The customer lodged a formal complaint against Harrison-Harper for embarrassing her in the store by instructing her to sell the shoes on eBay. Harrison-Harper admits this happened but maintains that the shoes were not returnable under Nike policy. On September 28, Harrison-Harper sent Sanders an email requesting a "touch base" meeting. He did not respond, and she emailed him again on October 2.

2

The next day, Sanders received multiple complaints against Harrison-Harper, this time from employees she managed. Lepera sent an email to Sanders complaining about Harrison-Harper's management of the store. She complained that Harrison-Harper was not available to staff and had forced her to use paid time off instead of bereavement leave when her grandfather passed away. That same day, Sanders also received an email from the manager of the Nike store, located next to the Converse store, reporting that workers from the Converse store had complained to her about Harrison-Harper's mismanagement.

Two days later, on October 5, Sanders received an email about a "possible employee discount violation." Appendix ("App.") 83. Harrison-Harper admits that her relatives violated the company's employee discount policy by claiming the discount at the Nike store when it was only available at the Converse store. Moreover, three of the four relatives who used the discount at the Nike store were not on Harrison-Harper's list of eligible family members, a pre-requisite for use of the discount. And the one relative listed, Harrison-Harper's cousin, was ineligible because the discount was only available for immediate relatives, not cousins. Harrison-Harper listed her cousin as her brother. After improperly making purchases with the employee discount at the Nike store, the four relatives then attempted to make a purchase with the discount at the Converse store. Harrison-Harper told Lepera to process the discount even though the family members were neither listed on the discount-eligibility form nor eligible to be.

The same day that Sanders received this information about the employee-discount violation, Harrison-Harper texted him requesting to talk. And she repeated this request the following day (October 6), stating that a "lead has been saying things about [her]."

3

App. 87. Also on October 6, the manager of the Nike store followed up from her previous email and informed Crystal Barlow, the Senior Employee Relations Specialist, that issues concerning Harrison-Harper had been brought to her attention on "multiple occasions." App. 85. Sanders then investigated the complaints about Harrison-Harper and found that the store's employees were not following the time and attendance policy, something that the store manager was responsible for overseeing.

Sanders and Harrison-Harper spoke on the phone on October 7. Sanders wanted to discuss his on-going investigation into her performance, and she wanted to report her concerns about Lepera. During the call, Harrison-Harper told Sanders that Lepera was "talking about [her] in a sexually suggestive way" and "making up lies about [her]." App. 112. Harrison-Harper explained that Lepera told people that Harrison-Harper had flirted with a minor, and that Lepera had gone through the social media account of Harrison-Harper's girlfriend. Harrison-Harper also told Sanders that she was concerned about Lepera's performance and her inability to follow the dress code. She expressed discomfort in having a conversation alone with Lepera, and Sanders agreed. Sanders testified that he believed nothing from the October 7 phone call warranted further investigation and that he did not interpret the complaints about Lepera to be complaints about "harassment on the basis of gender or sexual orientation." App. 88.

After the October 7 call, Sanders followed up with Barlow. They both "had concerns about [Harrison-Harper's] leadership performance." App. 90. The following week, on October 14, Harrison-Harper asked to follow up with Sanders about Lepera's performance issues. But when they spoke, Sanders reported the results of his

4

investigation, primarily regarding Harrison-Harper's failure to maintain time and attendance logs for her employees. Harrison-Harper claims maintaining such records was not a formal requirement of her position.

On October 27, Sanders met in person with Harrison-Harper to discuss "the employee discount violation, her failure to document time and attendance issues on the [] logs, and her plan to rehire Bacon," a woman she had previously fired for calling Lepera a "bitch." App. 91. Sanders expressed concern that re-hiring Bacon showed poor judgment by Harrison-Harper. After the meeting, Sanders sent Barlow a written summary and highlighted four concerns: (1) the costumer complaint regarding returning shoes; (2) the employee-discount violation; (3) the rehiring of Bacon; and (4) the failure to document and enforce time and attendance issues. Sanders recommended the termination of Harrison-Harper because he had lost confidence in her ability to perform the work, but he did not have the authority to fire an employee. Barlow approved the decision. Then Human Resources Business Partner Derek Lachman approved the decision. Harrison-Harper does not know Lachman and testified that he would not have a reason to retaliate against her. And finally, Kiefer approved the decision to fire Harrison-Harper. Harrison-Harper testified that she had met Kiefer at an event where they drank "excessively" so Kiefer could have a "negative opinion" of Harrison-Harper. App. 94. Harrison-Harper was terminated on October 28.

Harrison-Harper filed a lawsuit against Nike, alleging retaliation and hostile work environment in violation of Title VII of the Civil Rights Act and the PHRA. After discovery, Nike moved for summary judgment, which the District Court granted on all

5

claims. The court held that Harrison-Harper failed to establish a prima facie case of retaliation because there was no causal connection between the alleged protected activity and the adverse action. She limits her timely appeal to whether "the timing between the protected activity and the adverse action," often called "temporal proximity," was unusually suggestive in this case. Harrison-Harper Br. 15.[1]

II.[2]

Where, as here, there is no direct evidence of retaliation, a plaintiff must establish a prima facie case of retaliation by "show[ing] that (1) she engaged in protected activity, (2) the employer took a materially adverse action against her, and (3) there was a causal connection between the protected activity and the employer's action." LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 231 (3d Cir. 2007).[3] At issue here is the third prong in establishing a prima facie case: a causal connection between Harrison-Harper's protected activity — reporting alleged sexual harassment by Lepera — and Nike's termination of Harrison-Harper.

---

[1] Harrison-Harper abandoned on appeal her claim for hostile work environment, so we do not discuss it herein.

[2] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367(a), and we have jurisdiction under 28 U.S.C. § 1291. Our review of the District Court's grant of summary judgment is plenary, and it is "appropriate only if there 'is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Buhdun v. Reading Hosp. & Med. Ctr., 765 F.3d 245, 251 (3d Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). "We view the facts in the light most favorable to the non-moving party." Id.

[3] The standard for employer liability under the PHRA is the same as the standard for liability under Title VII. Knabe v. Boury Corp., 114 F.3d 407, 410 n.5 (3d Cir. 1997).

Harrison-Harper was fired three weeks after she reported the harassment to Sanders, and she argues that a three-week gap between the protected activity and the adverse action is unusually suggestive. Unusually suggestive temporal proximity between the protected activity and the adverse action can be sufficient "to create an inference of causality and defeat summary judgment." LeBoon, 503 F.3d at 232. There is "no bright line rule" for unusually suggestive temporal proximity. Id. at 233. We have held that three months is not enough, LeBoon, 503 F.3d at 233, but two days is, Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989). That said, courts review the whole record and not merely the length of time between protected activity and adverse action. Courts consider "intervening antagonism or retaliatory animus, inconsistences in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus," but also relevant to the analysis is whether employment-related issues are documented prior to the protected activity. LeBoon, 503 F.3d at 232-34. Courts look at all "circumstantial evidence that support[s] the inference" of causation. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000).

While three weeks is certainly a short period between the protected activity and the adverse action, Harrison-Harper fails to establish causation for two reasons. First, Sanders had received multiple complaints regarding her work and leadership before she reported the alleged harassment. The customer complaint was brought to Sanders' attention on September 24; Sanders received complaints from other employees on October 3; and Sanders learned of the employee-discount violation on October 5. Upon

7

investigation of these complaints, Sanders also learned of Harrison-Harper's failure to maintain time and attendance logs of her employees. And she did not report the alleged harassment until October 7. In LeBoon, there was "a clear pattern" of employment-related issues "even before any mention of possible [protected activity]" so the employee failed to establish a causal connection between the protected activity and her termination. 503 F.3d at 234. Similarly, there was a clear pattern of issues regarding Harrison-Harper's performance before she complained of the alleged harassment, so she cannot establish causation.

Second, four employees contributed to the decision-making process that resulted in her termination. All four approved the decision. And only one of the four, Sanders, had any knowledge of her report of the purported harassment. We have held that a plaintiff "cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted." Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 196 (3d Cir. 2015). In Daniels, a decision-maker regarding the termination testified in a deposition that he was unaware of the plaintiff's allegations, and the plaintiff did not rebut that evidence, so we held that the plaintiff could not meet her burden to establish a causal connection between her protected activities and the termination. Id. at 197. Similarly, Sanders testified that nothing in Harrison-Harper's allegations warranted an

8

investigation under the harassment policy, so he did not inform anyone of the allegations. And Harrison-Harper did not rebut that evidence.[4]

III.

For the foregoing reasons, we will affirm the District Court's grant of summary judgment in favor of Nike.

---

[4] In addition, Harrison-Harper argues that the issue of whether temporal proximity is unusually suggestive is one of fact, not law, and therefore was inappropriately decided on summary judgment. We regularly address this issue at the summary judgment stage, see, e.g., Daniels, 776 F.3d at 196; LeBoon, 503 F.3d at 232, so her argument fails.