**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-4373
_____

MICHELLE MOODY,
                                        Appellant

v.

ATLANTIC CITY BOARD OF EDUCATION


_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 1-14-cv-04912)
District Judge: Hon. Joseph H. Rodriguez
_____

Argued July 12, 2017
_____


Before: GREENAWAY, JR., SHWARTZ, and RENDELL,
Circuit Judges.

(Filed: September 6, 2017)

Samuel A. Dion, Esq. [ARGUED]
Dion & Goldberger
1845 Walnut Street
Suite 1199
Philadelphia, PA 19103
            Counsel for Appellant

Rachel M. Conte, Esq. [ARGUED]
Tracy L. Riley, Esq.
Law Offices of Riley and Riley
100 High Street
Suite 302
Mount Holly, NJ 08060
            Counsel for Appellee

_____

OPINION OF THE COURT
_____

SHWARTZ, Circuit Judge.

Michelle Moody sued the Atlantic City Board of Education ("Board") for sexual harassment and retaliation pursuant to Title VII, 42 U.S.C. §§ 2000e-2(a)(1), 3(a), and the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. §§ 10:5-12(a), (d). The District Court granted summary judgment to the Board, finding that the alleged harasser, Maurice Marshall, was not Moody's supervisor. Because Marshall was empowered to determine whether Moody worked at New York Avenue School, which had a direct impact on her pay, and the record reveals no one else provided supervision, the District Court erred in concluding Marshall was not her supervisor. In addition, because there are

2

disputed facts concerning whether Moody sustained a tangible employment action, and because the Board's defense rests in part on the resolution of this issue, the District Court prematurely considered the availability of the Ellerth/Faragher defense.  See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998); Faragher v. City of Boca Raton, 524 U.S. 775 (1998). Therefore, we will vacate and remand.

I[1]

In November 2011, the Board approved Moody's hiring as a substitute custodian.  As a substitute custodian, Moody filled in for full-time custodians but was not guaranteed any work.  During the 2011-2012 school year, Moody was rarely scheduled to work and in the summer of 2012, she asked a Board employee how to obtain more work.  The employee suggested that Moody introduce herself to the custodial foremen at the schools within the district.  Each school had a custodial foreman who was delegated the authority to select which substitute custodians worked at the school.

Around September 2012, Moody introduced herself to approximately ten custodial foremen at different schools, including Marshall, the custodial foreman at New York Avenue School.  By October 2012, Marshall was assigning Moody regular work.  Moody also met the custodial foreman at Pennsylvania Avenue School and occasionally worked there. The Board concedes that when Moody was working at

---

[1] Because we are reviewing a summary judgment record, we view the facts and make all reasonable inferences in Moody's favor.  Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 266-67 (3d Cir. 2005).

New York Avenue School, Marshall was acting in a supervisory capacity. Oral Argument at 18:07-18:30, <u>Moody v. Atl. City Bd. of Educ.</u> (3d Cir. July 12, 2017) (No. 16-4373), http://www.ca3.uscourts.gov/oral-argument-recordings (counsel for the Board stating that "it's reasonable that if Moody was called in by Marshall that day, and Marshall was the foreman at the school in charge of all the custodians, I think that it's reasonable that during that day he could be considered [to be] in a supervisory position"). The record does not indicate that anyone other than Marshall supervised Moody's work at New York Avenue School.

Moody claims that, around the end of October 2012, Marshall began making sexual comments to her and told her that he would assign her more hours if she performed sexual favors for him. According to Moody, Marshall "would often be very touch feely and grab [Moody's] breasts or buttocks at the work place." App. 123. Moody testified that: (1) in early November 2012, Marshall called Moody into his office and tried to remove her shirt; (2) in late November, Marshall called Moody into his office, where Moody found Marshall sitting unclothed on his office chair; and (3) in December 2012, Marshall grabbed Moody, pulled her towards him, and stated "[y]ou want more hours?" App. 216. On December 27, 2012, Marshall and Moody exchanged the following text messages:

> [Marshall:] U playing
> [Marshall:] Well
> [Marshall:] Ok ill hit u when I go to work
> [Moody:] In the am?
> [Marshall:] No tonight my other job am I getting all three holes
> [Moody:] No the hell u not

4

[Marshall:] How's penn treating u
[Marshall:] U got steady work and that's where
the contracts going to be at
[Marshall:] I got u

App. 127-28.  Moody interpreted these text messages to mean that Marshall could help her obtain a full-time contract to work at Pennsylvania Avenue School if she acquiesced to his sexual advances.  Moody said that Marshall came to Moody's house that evening and told her that she would get an employment contract if she had sex with him.  Marshall grabbed her and began to kiss her.  Moody "felt that [her] job had been threatened," and therefore she gave into Marshall's unwelcome advances and reluctantly had sex with him.  App. 217.  In the days following this encounter, Moody told Marshall that it would never happen again.

Despite her rebuke, Moody received assignments at New York Avenue School on December 30, 2012 and January 4, 7, 8, 11, 14, 15, and 22, 2013.  Moody, however, believed that Marshall treated her differently after she rejected him.  On January 23, 2013, for example, Moody went to New York Avenue School to pick up her paycheck from Marshall.  At the time, Marshall was playing ping pong and would not retrieve the check for her until he finished the game.  Moody also noticed that Michelle McArthur, a new female substitute custodian, appeared to be receiving hours instead of her.[2] Further, another custodian told Moody that she was on

---

[2] The payroll records in fact show that, in January 2013, Moody received no hours at New York Avenue School after January 22 and that McArthur received work on January 23, 24, 25, 28, and 29.

5

Marshall's "shit list."[3]  App. 119.  Later that day, Marshall and Moody exchanged the following text messages:

> [Moody:] U don't gotta act like that towards me, I understand your upset at me but, outside of that Im a good worker, but, Its cool
> [Marshall:] Wt are u talking about, I'm not into the drama
> [Moody:] Just making sure Im not on ya so call "shit list"
> [Marshall:] U are but not like that I won't stop u from getting I don't play games like that

App. 131.  Moody believed that Marshall delayed retrieving her paycheck and reduced her hours because she had rejected his sexual advances, and she exchanged more text messages with Marshall to that effect on January 29, 2013.  In these exchanges, Marshall seemed to deny having sex with Moody and asserted that Moody just said this because she was angry that he delayed retrieving her check.  Moody retorted "I have all the text messages and my parents saw u when u came to my house."  App. 135.[4]

On February 4, 2013, Moody met with Sherry Yahn, the Board's Assistant Superintendent, and informed Yahn that Marshall had been sexually harassing her.  Yahn immediately

---

[3] The custodian to whom Moody attributed this comment denied making it.

[4] During his deposition, Marshall denied sexually harassing Moody.  In addition, eight custodians at New York Avenue School stated that they had not witnessed any inappropriate behavior on the part of Marshall or Moody.

took Moody to Human Resources ("HR") to file a written complaint. HR subsequently began an investigation into Moody's complaint and ordered Moody and Marshall not to have contact with each other during the investigation.[5]

HR's March 2013 report of its investigation states that it interviewed Moody, Marshall, and eight custodians at New York Avenue School, but it did not reach a conclusion as to whether Moody was sexually harassed. Later that month, Moody filed a charge of discrimination with the Equal Employment Opportunity Commission.

The Board hired an outside law firm to conduct an independent investigation of Moody's claims. After considering the HR report and conducting further interviews, the firm issued a report in July 2013 finding that Moody was not subjected to sexual harassment or discrimination. The Board informed Moody of these findings but nonetheless ordered Marshall and Moody to avoid any contact with each other.

Moody filed a complaint against the Board in the United States District Court for the District of New Jersey, raising claims of sexual harassment and retaliation in violation of Title

---

[5] Moody's hours decreased in the months after she complained about Marshall. Compare App. 181-82 (showing that Moody was assigned to work 62 hours in October 2012, 115.5 hours in November 2012, 126.5 hours in December 2012, and 56 hours in January 2013), with App. 182 (showing that Moody was assigned to work 36 hours in February 2013, 23 hours in March 2013, 32.5 hours in April 2013, and 24 hours in May 2013).

VII and the NJLAD. Moody alleged that the Board subjected her to sexual harassment through Marshall and retaliated against her for complaining about the harassment.[6] The District Court found that Marshall was not Moody's supervisor and so the Board was not liable for his actions and, in any event, Moody did not show she suffered a tangible employment action. The District Court also found that because the Board took prompt action upon receipt of her complaint, it was entitled to the Ellerth/Faragher affirmative defense. As a result, the District Court granted summary judgment in the Board's favor. Moody appeals.

II[7]

We must decide whether the District Court erred by granting the Board's motion for summary judgment on Moody's sexual harassment and retaliation claims. Our review of the District Court's order granting summary judgment is plenary. Mylan Inc. v. SmithKline Beecham Corp., 723 F.3d 413, 418 (3d Cir. 2013). We apply the same standard as the District Court, viewing facts and making all reasonable inferences in the non-movant's favor. Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 266-67 (3d Cir. 2005). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute "is genuine only if there is a sufficient evidentiary basis on

_____

[6] Moody initially alleged that the Board retaliated against her by transferring her children to different schools, but she has since abandoned that theory.

[7] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. We have jurisdiction under 28 U.S.C. § 1291.

8

which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The moving party is entitled to judgment as a matter of law when the non-moving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

III

A

Title VII and the NJLAD prohibit sexual harassment because it is a form of sex discrimination.[8] Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65-66 (1986); Lehmann v. Toys 'R' Us, Inc., 626 A.2d 445, 452 (N.J. 1993).[9] At oral argument,

---

[8] Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  Under the NJLAD, it is unlawful "[f]or an employer, because of the . . . sex . . . of any individual . . . to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.J. Stat. Ann. § 10:5-12(a).

[9] The New Jersey Supreme Court "has frequently looked to federal precedent governing Title VII" to interpret and apply the NJLAD. Lehmann v. Toys 'R' Us, Inc., 626 A.2d 445, 452 (N.J. 1993).

9

Moody stated that she is proceeding based upon a hostile work environment theory of sexual harassment.[10]

"To succeed on a hostile work environment claim [against the employer], the plaintiff must establish that 1) the employee suffered intentional discrimination because of his/her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of respondeat superior liability." Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013) (citation omitted); see also Lehmann, 626 A.2d at 453 (setting forth elements of a hostile work environment claim under the NJLAD).[11]

---

[10] A plaintiff may also bring a sexual harassment claim pursuant to a "quid pro quo" theory. See Lehmann, 626 A.2d at 452 (explaining that quid pro quo sexual harassment "involves an implicit or explicit threat that if the employee does not accede to the sexual demands, he or she will lose his or her job, receive unfavorable performance reviews, be passed over for promotions, or suffer other adverse employment consequences").

[11] In Farrell v. Planters Lifesavers Co., we left open the question of whether the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), would apply in the context of a quid pro quo sexual harassment claim, and we have not yet spoken on whether the framework would apply to hostile work environment claims. 206 F.3d 271, 286 n.11 (3d Cir. 2000). Under McDonnell Douglas, once a plaintiff makes out a prima facie case of discrimination that resulted in an adverse employment action, the burden shifts to the defendant to show there was a legitimate nondiscriminatory

Viewed in a light most favorable to her, Moody's testimony about Marshall's sexual actions and his comments

reason for the adverse employment action. 411 U.S. at 802. If the defendant can articulate such a reason, the plaintiff is afforded an opportunity to show the reason is pretextual. Id. at 804-05. Some of our sister circuits have concluded that the McDonnell Douglas framework does not apply in hostile work environment sexual harassment cases. See Pollard v. E.I. DuPont de Nemours Co., 213 F.3d 933, 943 (6th Cir. 2000) (explaining that the McDonnell Douglas framework cannot apply to a hostile work environment sexual harassment claim because "there is no legitimate justification for such an environment, and thus recourse to the McDonnell Douglas test is not warranted"), rev'd on other grounds, 532 U.S. 843 (2001); Martin v. Nannie & The Newborns, Inc., 3 F.3d 1410, 1417 n.8 (10th Cir. 1993) (concluding that the plaintiff's failure to rebut the employer's legitimate, nondiscriminatory reason for her termination was not relevant to a hostile work environment claim), overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002); see also Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 510–11 (11th Cir. 2000) (concluding that the district court erred in applying the McDonnell Douglas framework to non-retaliation sexual harassment claims, and explaining that the Ellerth Court made no mention of McDonnell Douglas and that sexual harassment cases have developed separately from other claims under Title VII). We agree that the burden-shifting framework is inapplicable here because, as the Pollard court explained, there can be no legitimate justification for a hostile work environment. 213 F.3d at 943. Therefore, we will not apply the McDonnell Douglas burden-shifting framework to Moody's hostile work environment claim.

11

about her body supports her claim that Marshall's harassment occurred "because of [Moody's] sex." See Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 n.3 (3d Cir. 1990) ("The intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language is implicit, and thus should be recognized as a matter of course."), superseded in part by statute, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1072; Lehmann, 626 A.2d at 454 ("When the harassing conduct is sexual or sexist in nature, the but-for element will automatically be satisfied. Thus when a plaintiff alleges that she has been subjected to sexual touchings or comments . . . she has established that the harassment occurred because of her sex.").

Viewed from the same perspective, Marshall's conduct toward Moody, if proven, could be viewed by a reasonable juror as sufficiently "severe or pervasive" to support a hostile work environment claim. The "severe or pervasive" standard requires conduct that is sufficient "to alter the conditions of [the employee's] employment and create an abusive working environment."[12] Meritor, 477 U.S. at 67 (citation and internal

---

[12] The "severe or pervasive" standard is disjunctive and so "a plaintiff need not show that her hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." Pucino v. Verizon Wireless Commc'ns, Inc., 618 F.3d 112, 119 (2d Cir. 2010) (emphasis omitted); see also Castleberry v. STI Grp., 863 F.3d 259, 264 (3d Cir. 2017) (clarifying that "[t]he correct standard is severe or pervasive" and explaining that "severity and pervasiveness are alternative

12

quotation marks omitted). The question of "whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270-71 (2001) (citation and internal quotation marks omitted).

Moody testified that, in addition to the times Marshall made sexually charged comments to her and grabbed her, Marshall once called her into his office and, when she entered, she found Marshall sitting naked on a chair. On another occasion, Marshall allegedly called Moody into his office and attempted to take her shirt off. At another point, Marshall sent her a text message stating "am I getting all three holes" and thereafter showed up at her house uninvited and pressured her into having sex with him by threatening her job. App. 127; cf. Jin v. Metro. Life Ins. Co., 310 F.3d 84, 94 (2d Cir. 2002) ("Requiring an employee to engage in unwanted sex acts is one of the most pernicious and oppressive forms of sexual harassment that can occur in the workplace."). Although

---

possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive" (citation and internal quotation marks omitted)); Lehmann, 626 A.2d at 455 (explaining that the severe or pervasive test is "disjunctive" and "[t]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct" (citation and internal quotation marks omitted)).

13

Marshall denies this conduct, we must view the facts in Moody's favor. Hugh, 418 F.3d at 266-67. From this perspective, Moody's account provides sufficient evidence upon which a reasonable juror could conclude that she experienced severe harassment, and their different accounts of these events present disputed material facts for a jury to resolve.

Moody's account, if proven, could also provide a basis from which a reasonable juror could infer that Marshall's conduct detrimentally affected Moody and would have affected a reasonable person in similar circumstances. Moody's testimony suggests that she "subjectively perceive[d] the environment to be abusive." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). She testified that she believed Marshall expected to trade sexual favors for work and would seek retribution if she did not accede to his demands, and that he made her uncomfortable when he grabbed her and when he invited her to his office while he was unclothed. A reasonable person would likely also find such an environment "objectively hostile or abusive," id., because it is one where a perceived supervisor expected his subordinate to give sexual favors in exchange for work, touched a subordinate against her wishes, made sexual comments to her, and exposed himself to her.

Finally, since Moody sued the Board and not Marshall, we must consider whether there are disputed facts concerning the existence of respondeat superior liability. On this point, we look to agency principles and the Restatement (Second) of Agency § 219 for guidance.[13] Ellerth, 524 U.S. at 755-58. In

---

[13] Section 219 of the Restatement provides:

discussing § 219(1), the Ellerth Court observed that "[t]he general rule is that sexual harassment by a supervisor is not conduct within the scope of employment" but that, under § 219(2), "[i]n limited circumstances, agency principles impose liability on employers even where employees commit torts outside the scope of employment." Id. at 757-58. Most relevant here, under § 219(2)(d), a master may be subject to liability even when employees act outside the scope of their employment if they were "aided in accomplishing the tort by the existence of the agency relation." Restatement (Second) of Agency § 219(2)(d) (Am. Law Inst. 1958).

This "aided-in-the-accomplishment rule" can impose liability on employers for a supervisor's harassment. Liability

---

(1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.
(2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
　　(a) the master intended the conduct or the consequences, or
　　(b) the master was negligent or reckless, or
　　(c) the conduct violated a non-delegable duty of the master, or
　　(d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

Restatement (Second) of Agency § 219 (Am. Law Inst. 1958).

15

here is predicated upon the idea that the supervisor is able to take an employment action only because he or she is the employer's agent. Thus, "[w]hen a supervisor takes a tangible employment action" against a subordinate, the employer is vicariously liable because "the injury could not have been inflicted absent the agency relation." Vance v. Ball State Univ., 133 S. Ct. 2434, 2442 (2013) (citations and internal quotation marks omitted); see also id. (noting that a supervisor, as opposed to a co-worker, is in a sense always "aided by the agency relation" because "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character"). An employee is a supervisor for purposes of respondeat superior liability pursuant to Title VII if he or she is "empowered by the employer to take tangible employment actions." Id. at 2439. A "tangible employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Ellerth, 524 U.S. at 761.

There is no dispute that Marshall had the authority to decide whether to summon Moody to work at New York Avenue School because the Board granted him that authority as the custodial foreman. In fact, a Board employee suggested that Moody introduce herself to the custodial foremen as a means to obtain work assignments.[14] The authority to assign

---

[14] While the District Court and the Board are correct that Marshall was only one of multiple custodial foremen within the school district who could have assigned Moody work, we are aware of no authority indicating that an employee cannot have multiple supervisors. Such a rule would lead to the absurd result that employees with multiple managers have no

16

work is a "tangible employment action" because it is a decision that can "inflict[] direct economic harm," Ellerth, 524 U.S. at 762, by "causing a significant change in benefits," Vance, 133 S. Ct. at 2443. Given Marshall's power as a custodial foreman to even allow Moody to work, he could effect a "tangible employment action" by setting her hours and hence her pay. See Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227, 1231 (11th Cir. 2006) ("A reduction in an employee's hours, which reduces the employee's take-home pay, qualifies as a tangible employment action."). Marshall therefore had more than the power to direct Moody's work or to have her stay beyond her shift or cover an extra shift. He had the authority to determine whether Moody worked at all if he needed a substitute custodian. Marshall could avoid calling Moody into work if he chose; and in fact he did so on multiple occasions when a substitute custodian was needed at New York Avenue School. See App. 168, 171 (suggesting that Marshall called Michelle McArthur in to work on January 23–25 and 28–29 instead of Moody). Marshall had the authority to cause a significant change in Moody's benefits by assigning her no

---

"supervisors" for the purposes of Title VII and the NJLAD. Moreover, the fact that Marshall was unable to hire or fire employees is not dispositive of whether he is a supervisor. As we have explained, an employee capable of effecting a "tangible employment action" is a supervisor, Vance v. Ball State Univ., 133 S. Ct. 2434, 2439 (2013), and the concept of a tangible employment action extends beyond hiring and firing to decisions "causing a significant change in benefits," Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998), such as reduced work hours for an hourly worker, Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227, 1231 (11th Cir. 2006).

17

hours, thereby eliminating her take-home pay. Thus, Marshall's power to impact Moody's earnings is sufficient to qualify him as a supervisor. See Cotton, 434 F.3d at 1231. Moreover, the Board conceded that while Moody was working at New York Avenue School, Marshall was acting in a supervisory capacity. Oral Argument at 18:07-18:30, Moody v. Atl. City Bd. of Educ. (3d Cir. July 12, 2017) (No. 16-4373), http://www.ca3.uscourts.gov/oral-argument-recordings. Furthermore, no one else was identified in the record as having authority over Moody, other than the custodial foremen who could assign her work at their schools. While other foremen also could have arguably been Moody's supervisors, Marshall assigned Moody over 70% of her hours from October 2012 through February 2013.[15]

In summary, the record here supports the conclusion that Marshall was Moody's supervisor because (a) the Board empowered him as the custodial foreman to select from the list of substitute custodians who could actually work at New York Avenue School;[16] (b) the Board conceded that while Moody

---

[15] The Dissent suggests that, by considering the payroll records, the Majority is reverting to a pre-Vance rule for determining who is a supervisor. This is not the case. We are simply using the records to corroborate the conclusion that Marshall controlled a sizeable amount of Moody's work, and hence her compensation—the benefit she received from her employment.

[16] This is not to say that every employee tasked with creating a work schedule is a supervisor for Title VII and NJLAD purposes. See Vance, 133 S. Ct. at 2448 ("The ability to direct another employee's tasks is simply not sufficient."). The Dissent cites to not precedential opinions of other circuits

18

was on school premises, Marshall served in a supervisory role; (c) the record identifies no other person who was present full time or even sporadically on the school's premises, or anywhere for that matter, who served as Moody's supervisor; and (d) since Moody's primary benefit from her employment was hourly compensation, and since Marshall controlled 70% of her hours, his decision to assign or withhold hours significantly affected her pay.[17] Thus, the record shows that Marshall was Moody's supervisor, as defined under Vance, for whose conduct the Board may be liable.[18]

discussing nonsupervisory employees, but we are bound by our precedent and our custom not to rely on not precedential opinions of our Court and, by extension, those of our sister circuits. See I.O.P. 5.7.

[17] The Dissent says that the fact Moody was not entitled to any work, and hence not entitled to any benefits, means that she could not experience a change to her benefits. This implies that Moody would not be protected from sexual harassment no matter who was her supervisor. The law, however, protects workers from sexual harassment. Thus, while Moody was not guaranteed any work hours, and by extension had no guaranteed benefits, she, like other hourly workers covered by Title VII and the NJLAD, is guaranteed to be protected from sexual harassment by her supervisor.

[18] As is apparent, the Majority has not ignored Vance but in fact heeded its instructions. Moreover, even under the Dissent's articulation of Vance's requirements, the outcome is the same: Marshall was Moody's supervisor. The Dissent poses one of Vance's considerations for determining whether a person is a supervisor as follows: "Could Marshall . . . make a decision that caused a significant change in [Moody's] benefits?" Dissent at 6. The answer to this question is

19

B

The Board argues that, even if Marshall was Moody's supervisor and he harassed her, it would not be liable for his conduct pursuant to the Ellerth/Faragher defense.  An employer can establish an affirmative defense to liability for a supervisor's creation of a hostile work environment by showing "(1) that it exercised reasonable care to prevent and promptly correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any

---

unequivocally yes.  Marshall had the authority from the Board to determine whether Moody worked at all at New York Avenue School and this authority was not vague or "ill-defined."  Vance, 133 S. Ct. at 2443.

Moreover, contrary to the Dissent's characterization, the Majority is not simply relying on the fact that Marshall could assign Moody work hours.  Marshall was not a mere scheduler, assigning hours among those who were in a pool of employees.  Marshall controlled whether Moody worked at New York Avenue School at all.  Furthermore, the record does not reflect that anyone else was Moody's supervisor.  The Dissent challenges this statement by citing to Moody's deposition testimony where she was asked whether she discussed Marshall's behavior with anyone such as the principal or Marshall's supervisor.  This exchange, however, does not indicate that either of these people supervised her pursuant to Vance.  Moreover, while the Dissent suggests that those who hired Moody qualify as her supervisors under Vance, even if that were so, this does not mean Marshall was not also her supervisor.

20

preventive or corrective opportunities that were provided." Vance, 133 S. Ct. at 2442 (citing Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765). Under Federal Rule of Civil Procedure 8(c), "[i]n responding to a pleading, a party must affirmatively state any . . . affirmative defense." Fed. R. Civ. P. 8(c)(1); see also Ellerth, 524 U.S. at 765 (describing the defense as an "affirmative defense" and citing to Rule 8(c)). "An affirmative defense which is neither pleaded as required by [R]ule 8(c) nor made the subject of an appropriate motion under [R]ule 12(b) is waived." Sys. Inc. v. Bridge Elecs. Co., 335 F.2d 465, 466 (3d Cir. 1964). However, an affirmative defense generally "need not be articulated with any rigorous degree of specificity, and is sufficiently raised for purposes of [Federal] Rule [of Civil Procedure] 8 by its bare assertion." Zotos v. Lindbergh Sch. Dist., 121 F.3d 356, 361 (8th Cir. 1997) (citation and internal quotation marks omitted). While the Board's answer did not explicitly identify the Ellerth/Faragher defense, the answer states that the Board "at all times, acted in good faith and based on reasonable and rational decision-making and procedure delegated to it under the laws of the State of New Jersey." Def. App. 60. This statement is sufficient to raise the assertion that the Board acted with "reasonable care" under the first prong of the Ellerth/Faragher analysis regarding promptly taking corrective action. The Board's answer also states that Moody's damages were barred by her "failure to mitigate." Def. App. 60. Under the second prong of the Ellerth/Faragher analysis, a plaintiff's failure to take advantage of preventative or corrective opportunities at a school could be characterized as a "failure to mitigate" damages. See Adams v. Austal, U.S.A., L.L.C., 754 F.3d 1240, 1258 (11th Cir. 2014) (finding that pleading of "failure to mitigate" sufficiently raised an Ellerth/Faragher defense). Accordingly, while it would have been better to more

21

explicitly assert the Ellerth/Faragher defense, the Board's answer provides sufficient notice of its intent to raise it. See Robinson v. Johnson, 313 F.3d 128, 134-35 (3d Cir. 2002) ("The purpose of requiring the defendant to plead available affirmative defenses in [its] answer is to avoid surprise and undue prejudice by providing the plaintiff with notice and the opportunity to demonstrate why the affirmative defense should not succeed.").

The Board's brief in support of its motion for summary judgment also alludes to the Ellerth/Faragher defense, even though it is not mentioned by name. Its brief emphasizes that Moody did not report the harassment until February 4, 2013, and the Board immediately took action and conducted a thorough investigation upon receiving her complaint. These arguments address the Ellerth/Faragher analysis by claiming that Moody failed to take advantage of corrective opportunities when she did not timely report the harassment, and asserting that the Board acted reasonably by immediately conducting a thorough investigation into Moody's complaint. Therefore, the Board did not waive its Ellerth/Faragher defense.

The Ellerth/Faragher defense, however, is available only where the plaintiff did not experience a "tangible employment action." Ellerth, 524 U.S. at 765. Moody argues that she experienced a tangible employment action by receiving reduced hours from Marshall. There are many ways Moody's work hours could be viewed. For example, Moody worked more hours for Marshall in the three pay periods before she rejected his advances than in the three pay periods after she rejected them. Compare App. 156, 159, 162 (showing that Moody worked a total of 94 hours at New York Avenue School in the pay periods of November 19-30, December 3-14, and

22

December 17-28), <u>with</u> App. 165, 168, 171 (showing that Moody worked a total of 62.5 hours at New York Avenue School in the pay periods of December 31-January 11, January 14-25, and January 28-February 8). A reasonable juror could conclude that Marshall gave Moody hours to entice her to accede to his sexual demands and then reduced her hours after she rejected him. On the other hand, Moody received about the same number of hours at New York Avenue School in January 2013, after she rejected Marshall, as she did in December 2012, before she rejected Marshall. <u>Compare</u> App. 156, 159, 162, 165 (showing that Moody worked a total of 54.5 hours at New York Avenue School in December 2012), <u>with</u> App. 165, 168, 171 (showing that Moody worked a total of 56 hours at New York Avenue School in January 2013). A reasonable juror could therefore also conclude that Marshall did not reduce Moody's hours at all following her rejection of his advances. Because Moody's pay records are central to the question of whether she suffered a tangible employment action and could reasonably be viewed in two ways, there is a disputed issue of material fact as to whether she suffered a tangible employment action. Because the <u>Ellerth/Faragher</u> defense is available only where there is no tangible employment action, <u>Ellerth</u>, 524 U.S. at 765, a jury must first decide whether there was such an action. If the jury concludes that there was not, the District Court or jury (if there are disputed material facts with respect to the <u>Ellerth/Faragher</u> defense) may then decide whether the Board avoids liability based on the defense. Because there are disputed facts concerning whether Marshall took a tangible employment action against Moody, and the answer to that question dictates whether the Board may invoke the <u>Ellerth/Faragher</u> defense, we will vacate the District Court's order granting summary

23

judgment in the Board's favor on Moody's hostile work environment claim.

IV

Title VII and the NJLAD make it unlawful for an employer to retaliate against an employee who complains about employment discrimination.[19] To establish a prima facie case of retaliation under Title VII, a plaintiff must show "(1) [that she engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 193 (3d Cir. 2015) (citation and internal quotation marks omitted); Craig v. Suburban Cablevision, Inc., 660 A.2d 505, 508 (N.J. 1995) (reciting similar elements for NJLAD retaliation).

As to the first element of the prima facie case, Moody filed a written complaint about Marshall's alleged sexual

---

[19] Title VII makes it unlawful "for an employer to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Similarly, under the NJLAD, it is unlawful "[f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act." N.J. Stat. Ann. § 10:5-12(d).

harassment with the Board on February 4, 2013, and the Board concedes that this action constitutes an "activity protected by Title VII." App. 56; see Daniels, 776 F.3d at 193 (noting that protected activity includes "informal protests of discriminatory employment practices, including making complaints to management" (citations and internal quotation marks omitted)).

As to the second element, we must determine whether Moody suffered a materially adverse action. In this context, a materially adverse action is one that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 195 (citations and internal quotation marks omitted). Here, after Moody filed her February 2013 complaint of sexual harassment, she experienced a drop in the hours she was assigned. In the four months preceding her complaint, Moody worked a total of 360 hours. See App. 181-82 (showing that Moody was assigned to work 62 hours in October 2012, 115.5 hours in November 2012, 126.5 hours in December 2012, and 56 hours in January 2013). By comparison, in the four months following her complaint, Moody worked a total of 115.5 hours. See App. 182 (showing that Moody was assigned to work 36 hours in February 2013, 23 hours in March 2013, 32.5 hours in April 2013, and 24 hours in May 2013). Therefore, Moody's working hours declined three-fold in the months following her complaint as compared to the months preceding her complaint. Viewing these facts in a light most favorable to the non-movant, a reasonable employee could view this reduction of work hours, and the resulting decreased pay, as sufficient to discourage him or her from filing a sexual harassment complaint. Therefore, Moody satisfies the second element of the prima facie case.

Finally, as to whether there is a causal connection between the plaintiff's protected activity and the employer's adverse action, a court considers a "broad array of evidence," including whether there is an "unusually suggestive" temporal proximity between the protected activity and adverse action. Daniels, 776 F.3d at 196 (citations and internal quotation marks omitted). An inference of "unduly suggestive" temporal proximity begins to dissipate where there is a gap of three months or more between the protected activity and the adverse action. LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 233 (3d Cir. 2007). In this case, as noted above, Moody's working hours declined immediately following the filing of her complaint and never recovered. In fact, in the two pay periods directly following the filing of her complaint, Moody was not assigned any hours. See App. 173-77 (showing no hours worked for Moody during the pay periods of February 11-22 and February 25-March 8). The close temporal connection between Moody's complaint and the reduction in her hours is "unduly suggestive" and sufficient to provide prima facie evidence of a causal connection.

Accordingly, Moody has established a prima facie case of retaliation under Title VII and the NJLAD.[20]

---

[20] While there may be a legitimate, nondiscriminatory reason for the reduction in Moody's hours, neither the parties nor the District Court addressed it because the District Court concluded that Moody did not establish a prima facie case of retaliation. See Daniels, 776 F.3d at 193 (stating that after the plaintiff makes out her prima facie case, "the burden of production of evidence shifts to the employer to present a legitimate, non-retaliatory reason for having taken the adverse

V

For the foregoing reasons, we will vacate the judgment of the District Court and remand for further proceedings.

---

action"). The District Court may address this issue on remand, and we express no opinion on its proper resolution.

*Michelle Moody v. Atlantic City Board of Education*

No. 16-4373

---

**RENDELL**, *Circuit Judge*, concurring in part and dissenting in part.

Four years ago in *Vance v. Ball State University*, 133 S. Ct. 2434 (2013), the Supreme Court set forth a clear and straightforward test for determining whether an employee ought to be considered a "supervisor" for purposes of the employer's vicarious liability for sexual harassment in the workplace under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1). The Majority's decision to deem Marshall a "supervisor" and allow Moody's hostile work environment claim to move forward totally ignores, and is inconsistent with, this recent pronouncement. For that reason, I respectfully dissent.[1]

## I. "Supervisor" Before *Vance*

The Supreme Court first attached significance to the "supervisor" label in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). In those cases, the Supreme Court held that an employer will be held vicariously liable for its employees who engage in discrimination such as sexual

---

[1] I do not take issue with the Majority's judgment on Moody's retaliation claim.

harassment, even in the absence of negligence, if the harasser was a "supervisor" who took a "tangible employment action" against the victim. *See Ellerth*, 524 U.S. at 762; *Faragher*, 524 U.S. at 790. These cases defined a "tangible employment action" as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761. They explained that "[a] tangible employment decision requires an official act of the enterprise, a company act[,]" which "in most cases is documented in official company records, and may be subject to review by higher level supervisors." *Id.* at 762.

Although *Ellerth* and *Faragher* confirmed the significance of supervisor status for Title VII claims, they left the term "supervisor" undefined.[2] This lack of guidance led to a circuit split. Some courts interpreted the case law to "presuppose[] a clear distinction between supervisors and co-workers" that focused on such discrete responsibilities as hiring/firing, promoting/demoting, transferring, and disciplining, while others followed the "open-ended approach advocated by the EEOC's Enforcement Guidance, which tie[d] supervisor status to the ability to exercise significant

---

[2] In both *Ellerth* and *Faragher*, the status of the alleged harasser was not in dispute and so the Supreme Court did not need to reason through this issue. *See Vance*, 133 S. Ct. at 2447 ("In light of the parties' undisputed characterization of the alleged harassers, this Court simply was not presented with the question of the degree of authority that an employee must have in order to be classified as a supervisor.").

2

direction over another's daily work." *See Vance*, 133 S. Ct. at 2443 (contrasting the former approach taken by the First, Seventh, and Eighth circuits with the latter approach taken by the Second and Fourth circuits). The EEOC's Enforcement Guidance set forth vague qualitative and quantitative guidelines:

> [A]n employee, in order to be classified as a supervisor, must wield authority of sufficient magnitude so as to assist the harasser explicitly or implicitly in carrying out the harassment. . . . [T]he authority must exceed both an ill-defined temporal requirement (it must be more than occasiona[l]) and an ill-defined substantive requirement (an employee who directs only a limited number of tasks or assignments for another employee . . . would not have sufficient authority to qualify as a supervisor.[)].

*Id.* at 2449 (citations and internal quotation marks omitted) (third alteration in original). Courts adopting the EEOC's Enforcement Guidance thus considered "the number (and perhaps the importance) of the tasks in question [as] a factor to be considered in determining whether an employee qualifies as a supervisor." *Id.* at 2450. In *Vance*, the Supreme Court noted that this approach resulted in a "standard of remarkable ambiguity" given that "[k]ey components of that standard—'sufficient' authority, authority to assign more than a 'limited number of tasks,' and authority that is exercised more than 'occasionally'—have no clear meaning." *Id.*

3

Prompted by the deepening divide among the circuits and the myriad variations that the label "supervisor" had come to connote depending on the context,[3] *Vance* finally addressed the "supervisor" question.

## II. *Vance v. Ball State University*

Writing for the majority in *Vance*, Justice Alito made it quite clear that the Supreme Court was announcing a new, "readily applied" test for determining whether one is a "supervisor" for purposes of hostile work environment claims brought under Title VII. *Id.* at 2449. The case marked a shift in analysis away from the "nebulous definition," *id.* at 2443, or "study in ambiguity," *id.* at 2449, that had previously applied. No longer is there an assortment of "varying meanings" that can be considered, *id.* at 2446, or "a highly

---

[3] *See Vance*, 133 S. Ct. at 2444 ("A comparison of the definitions provided by two colloquial business authorities illustrates the term's imprecision in general usage. One says that '[s]upervisors are usually authorized to recommend and/or effect hiring, disciplining, promoting, punishing, rewarding, and other associated activities regarding the employees in their departments.' Another says exactly the opposite: 'A supervisor generally does not have the power to hire or fire employees or to promote them.' . . . If we look beyond general usage to the meaning of the term in other legal contexts, we find much the same situation. Sometimes the term is reserved for those in the upper echelons of the management hierarchy. . . . But sometimes the term is used to refer to lower[-]ranking individuals.") (citation and footnotes omitted) (alteration in original).

case-specific evaluation of numerous factors" in which courts ought to engage, *id*. at 2443. Rather, the newly streamlined test is whether the person in question has the authority—"empowered by the employer"—to alter the employee's status. *Id.* at 2439. Courts are now charged with asking whether the employee in question is capable of taking one of several discrete actions toward the employee: Can that person hire or fire the employee? Can that person promote or demote the employee? Can that person reassign the employee with significantly different responsibilities or make a decision that causes a significant change in the employee's benefits? If none of these questions can "readily" be answered in the affirmative, then the inquiry ends and the reviewing court may not deem that employee a "supervisor." This bright-line approach fosters an "easily workable" definition that "can be applied without undue difficulty at both the summary judgment stage and at trial." *Id.* at 2444 (also observing that "[t]he alternative, in many cases, would frustrate judges and confound jurors").[4]

---

[4] Clarifying *Ellerth* and *Faragher*, Justice Alito stated:

> Those decisions contemplate a unitary category of supervisors, *i.e.,* those employees with the authority to make tangible employment decisions. There is no hint in either decision that the Court had in mind two categories of supervisors: first, those who have such authority and, second, those who, although lacking this power, nevertheless have the ability to direct a co-worker's labor to some ill-defined degree. On the contrary, the *Ellerth*/*Faragher* framework is one under which supervisory

5

### III.  Marshall Is Not a "Supervisor" Under *Vance*

Turning to our case, I would have applied the unambiguous test that *Vance* established rather than the Majority's open-ended, multi-factor approach that *Vance* explicitly rejected.  Could Marshall hire or fire Moody?  Could Marshall promote or demote Moody?  Could Marshall reassign Moody with significantly different responsibilities or make a decision that caused a significant change in her benefits?  The record undoubtedly answers all of these questions in the negative.

The Majority primarily argues that Marshall was Moody's "supervisor" because he could cause a significant change in Moody's benefits by virtue of his ability to assign her hours and his record of assigning her a significant number of hours.  The Majority relatedly urges that Marshall's supervisory status also stems from his ability "to determine whether Moody worked at all" at the New York Avenue School.  Maj. Op. at 18.  But as the record and relevant case

> status can usually be readily determined, generally by written documentation.

*Id.* at 2443.  *Ellerth* held that "[t]angible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates."  524 U.S. at 762.  Elucidating this statement, *Vance* rejected the "open-ended approach" and held that "[t]he strong implication of this passage is that the authority to take tangible employment actions is the defining characteristic of a supervisor, not simply a characteristic of a subset of an ill-defined class of employees who qualify as supervisors."  133 S. Ct. at 2448.

6

law demonstrate, neither characterization of Marshall's responsibilities is enough to render Marshall a "supervisor" under *Vance*. I will address each one in turn.

**A.**

The Majority contends that because Marshall impacted Moody's "benefits"—*i.e.,* her pay by virtue of giving, or not giving, work—he was her "supervisor." *Id.* Due to the number of hours he assigned her (and then ultimately did not assign her), the argument goes, this impact was "significant" so as to make Marshall's assignment of work fit within the last phrase of the *Ellerth* description of tangible employment actions—a decision that causes a "significant change in benefits." *Id.* at 17 (citation omitted); *see also id.* at 18 ("Marshall assigned Moody over 70% of her hours from October 2012 through February 2013"). This contention, and the approach it rests on, squarely contradicts *Vance*, as Moody was not entitled to any "benefits" that could be "change[d]."

The Majority rightly notes that as a substitute custodian, Moody "was not guaranteed any work." *Id.* at 3. Moody well understood what her position entailed, as she testified in her deposition that she was never entitled to a minimum number of days of work per week, fixed tenure, raise in salary, promotion to full-time custodian, or any additional benefits. (*See* A. 206–09.) Indeed, when she wanted more assignments, Moody knew she needed to take the initiative to introduce herself to the foremen and make it known that she was available. Moody's arrangement with the Board is dispositive of the supervisor question, as the benefits to which she was entitled constitute our starting point

7

for assessing whether there was a "significant change." But as Moody testified, there were no benefits to which she was entitled.

"Significant change in benefits," placed as it is in *Ellerth* as the last phrase following such discrete capabilities as hiring and firing, *see* 524 U.S. at 761, must involve a change in some specific aspect of employment that has already been contracted for or is reasonably expected, such as take-home pay, vacation days, health coverage, and the like. Moody was not entitled to, nor had any expectation of, any of these types of benefits, and Marshall did not have any authority to provide them, let alone alter them. While he could assign her work, as could the other ten foremen, *Vance* rejected that capability as part of a nebulous supervisor calculus. *See Vance*, 133 S. Ct. at 2445–46 (citing 5 C.F.R. § 9701.212(b)(4) as an example that in some legal contexts, "supervisory work . . . may involve hiring or selecting employees" and "assigning work," and noting that "the term 'supervisor' has varying meanings both in colloquial usage and in the law" and that therefore a streamlined definition was necessary for Title VII purposes).

Furthermore, if impacting pay by giving or not giving work elevates an employee to supervisor status, every person in charge of the weekly roster for hourly workers such as waiters, nurses, truckers, and the like will be supervisors if they sufficiently favor, or disfavor, certain of those workers. And such a purported "supervisor" would not be a "supervisor" of those employees whose hours were not significantly impacted. The analysis espoused by the Majority today would have courts engage in a rigorous fact-checking of payroll records and then not only calculate the

8

total number of hours worked but also identify and contrast patterns of those hours over time and among employees.[5] Such an undertaking is precisely the sort of "highly case-specific evaluation" that *Vance* eliminated. Even if we were permitted to engage in that sort of inquiry, the Majority's conclusion would still be erroneous because Marshall's responsibilities do not take on greater weight—and, by extension, do not render him a "supervisor"—simply because Moody happened to be more successful with him than with other foremen in securing work. Marshall's responsibilities are defined at the front-end by the terms set by the employer, which in this case, simply did not task Marshall with a supervisory role as contemplated by *Vance*.

Marshall's assignment of hours, and its impact on Moody's pay, is only noteworthy because Moody was a wage employee and not a salaried one. The few courts of appeals to address the "supervisor" question have noted this distinction—wage employee as opposed to salaried—but then have rejected the idea that influencing hours and pay in this

---

[5] The Majority aims to downplay its rigorous examination of the record (and, more specifically, its reliance on the payroll records), by stating that it is "simply using the records to corroborate the conclusion that Marshall controlled a sizeable amount of Moody's work, and hence her compensation—the benefit she received from her employment." Maj. Op. at 18 n.15. This understatement is puzzling, as the Majority's conclusion that the impact of Marshall's assignments on Moody's take-home pay rendered him a "supervisor" is necessarily drawn from and dependent on an analysis of these very records.

9

way could render an employee a "supervisor." *See EEOC v. Autozone, Inc.*, No. 16-6387, 2017 WL 2506526, at \*2–3 (6th Cir. June 9, 2017) (implying that victim was an hourly employee but still finding that harasser was not her "supervisor" because he could not fire, demote, promote, or transfer, and noting that "*Vance* establishes a sharp line between co-workers and supervisors, not an invitation for speculation about amorphous levels of influence") (citation and internal quotation marks omitted); *Chavez-Acosta v. Sw. Cheese Co., LLC*, 610 F. App'x 722, 730 (10th Cir. 2015) (holding that an employee was not a "supervisor" because he could not effect "significant change" in the victim's employment even though he was a "team leader" in the department in which the victim worked and even though the victim was an hourly employee); *McCafferty v. Preiss Enters., Inc.*, 534 F. App'x 726, 728, 731 (10th Cir. 2013) (finding no "supervisor" status for an employee who oversaw and assigned work to McDonald's crewmembers and noting that "[i]f mere influence in tangible employment decisions rendered a co-worker a supervisor, this exception would swallow the rule").

Other courts of appeals have likewise found supervisor status to be lacking when reviewing responsibilities similar to those assigned to Marshall. *See Kim v. Coach, Inc.*, No. 14-16248, 2017 WL 2615457, at \*1 (9th Cir. June 16, 2017) (finding no supervisor status for employee who could give instructions about work); *Matherne v. Ruba Mgmt.*, 624 F. App'x 835, 840 (5th Cir. 2015) (finding no supervisor status for employee who had some leadership authority, including control over a book where managers would make comments if anything went wrong in the workplace, but could not hire, fire, promote, demote, transfer, or discipline); *Spencer v.*

10

*Schmidt Elec. Co.*, 576 F. App'x 442, 447–48 (5th Cir. 2014) (finding no supervisor status for employee who could give other employees direction on how to do their jobs but could not fire anyone without permission, and noting that "evidence . . . that a foreman was authorized to direct the employee's daily work activities . . . is the definition of supervisor expressly rejected by the Supreme Court") (internal quotation marks omitted). Conversely, courts have found that an employee qualifies as a supervisor when empowered to take the sorts of actions that Marshall could not. *See Voltz v. Erie Cty.*, 617 F. App'x 417, 424 (6th Cir. 2015) (employee who could interview and hire candidates, determine salary increases, and make recommendations regarding employee terminations was a "supervisor"). The only case that the Majority cites to support its elastic definition of "supervisor" as encompassing reducing another's hours, *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227 (11th Cir. 2006), was decided over seven years before *Vance* and focused on "highly case-specific" factors that *Vance* explicitly rejected. *See Vance*, 133 S. Ct. at 2443 (rejecting the notion that one who "ha[s] the ability to direct a co-worker's labor to some ill-defined degree" may properly be considered a "supervisor").

**B.**

The Majority relatedly contends that Marshall had the authority to determine "whether Moody worked at all" at the New York Avenue School. Maj. Op. at 18. Relying solely on *Cotton*, this line of argument urges that "Marshall had the authority to cause a significant change in benefits by assigning her no hours, thereby eliminating her take-home pay." *Id.* But such a characterization, insinuating that

11

Moody's fate as a Board employee was entirely up to Marshall, blatantly ignores the fact that Marshall had no control whatsoever over Moody's ability to work at the ten other schools, and that she was only prohibited from working at the New York Avenue School after other Board employees told her to have no further contact with Marshall following her internal complaint.

Seeking to portray Marshall as the ultimate decision-maker of Moody's work status, the Majority states that "no one else was identified in the record as having authority over Moody, other than the custodial foremen who could assign her work at their schools." *Id.* Such a gap in the record would prove nothing regarding *Marshall*'s authority over Moody—the issue dispositive to Moody's hostile work environment claim. This description of the record is also wrong. For example, Moody's deposition indicates the presence of at least one other Board employee at the New York Avenue School whose authority over her was superior to Marshall's. Moody testified to the effect that Marshall was not in charge at the New York Avenue School during the time that Moody worked there. The relevant exchange occurred during questioning regarding Moody's description of Marshall grabbing her in a school stairwell to kiss her:

> Q. Did you discuss your discomfort with anyone?
> A. No.
> Q. *So you didn't tell the building supervisor, like the building principal?*
> A. No.
> Q. Mr. Marshall's supervisor?
> A. No.

12

Q.  How about the police?
A.  No.

(A. 212 (emphasis added).)  This exchange suggests that there was someone else stationed at the New York Avenue School to whom Moody reported and who had supervisory authority over her.  The record also identifies the Board employees who hired Moody and who therefore were her supervisors under *Vance*.[6]  These examples from the record seriously undermine the Majority's notion that "no one else" had "authority over Moody."

The Majority's reasoning further suffers from the absence of any limiting principle that the Supreme Court in *Vance* was so determined to impose in employment cases like this one.  The Majority reasons on the one hand that Marshall's ability to put together Moody's schedule at the New York Avenue School rendered him her "supervisor" and, on the other hand, that "not . . . every employee tasked with creating a work schedule is a supervisor for Title VII . . . purposes."  Maj. Op. at 19 n.16.  But the Majority fails to explain—let alone cite any supporting legal authority—why we ought to set aside the dictates of *Vance* and find that "creating a work schedule" is sufficient in this case.  This omission is particularly glaring because the three other factors relied upon by the Majority—the Board's so-called

---

[6] Though the Majority emphasizes that *Vance* did not preclude the possibility of multiple supervisors, that lack of explicit preclusion says nothing about whether Marshall himself enjoyed supervisory power over Moody.

13

"concession" of Marshall's status;[7] the record's "failure" to identify an alternative supervisor; and the Majority's analysis of Moody's payroll records—do not make the case for deeming Marshall a "supervisor."

All Marshall could do vis-à-vis Moody was schedule her hours at one out of the eleven schools at which she was qualified to work. If that alone, as the Majority concedes, is insufficient to render an employee a "supervisor," how can Marshall possibly be Moody's "supervisor" as defined by *Vance*? The gloss that the Majority seeks to put on Marshall's (limited) responsibilities is wholly belied by the facts of the record and the requirements of the law.

## IV. Conclusion

Whether or not we agree with the narrowed definition of "supervisor" set forth in *Vance* that will necessarily eliminate some employees' claims against employers for hostile or harassing conduct, we are bound to follow the Supreme Court's renunciation of the idea that one who assigns work is a supervisor:

> Particularly in modern organizations that have abandoned a highly hierarchical management structure, it is common for employees to have overlapping authority with respect to the

---

[7] The Board's remark during oral argument that Marshall was acting in a supervisory capacity when Moody worked at the New York Avenue School only evinces the Board's own misunderstanding of the concept of "supervisor."

assignment of work tasks. Members of a team may each have the responsibility for taking the lead with respect to a particular aspect of the work and thus may have the responsibility to direct each other in that area of responsibility.

*Vance*, 133 S. Ct. at 2452. In making this statement, *Vance* was responding to—and rejecting—the dissenting justices' observation, now adopted by the Majority in this case, that "individuals with the power to assign daily tasks are often regarded by other employees as supervisors." *Id*. Even if that perception exists, it is not the law for purposes of Title VII. The Supreme Court has now held that the responsibility to direct others does not make an employee a "supervisor," and this ruling dictates that Marshall was not Moody's "supervisor."[8]

Our limited role for purposes of this appeal is not to figure out precisely who at the Board had supervisory power over Moody. We need only address whether Marshall did in

---

[8] I echo Justice Alito's remark in *Vance* that victims of sexual harassment perpetrated by employees not considered "supervisors" may still pursue other related claims under Title VII, including negligence and quid pro quo (a claim that Moody's counsel inexplicably dropped at oral argument). *See* 133 S. Ct. at 2452. The Majority's conclusion that my application of *Vance* to Moody's claim would preclude similarly situated employees from protection against sexual harassment is a reformulation of an argument raised by the dissenting justices in *Vance*—and quickly rejected by the majority in that case. *See id.* at 2451.

15

order to allow Moody's hostile work environment claim to proceed. It is clear to me, with *Vance* as binding precedent, that he did not. The Majority's conclusion to the contrary is simply incorrect.